NORDBERG INC., Plaintiff,

v.

TELSMITH, INC., Defendant.

No. 90–C–555.

United States District Court,
E.D. Wisconsin.

March 29, 1995.

James E. Braza, Davis & Kuelthau, Milwaukee, WI, Lawrence J. Crain and Roger D. Greer, Greer, Burns & Crain, Ltd., Chicago, IL, for plaintiff.

Andrew J. Nilles, James E. Nilles, Nilles & Nilles, Milwaukee, WI, Richard W. Bethea, Jr. and Arthur P. Brock, Stophel & Stophel, Chattanooga, TN, for defendant.

### DECISION AND ORDER

RANDA, District Judge.

This patent infringement case comes before the Court for decision after a three-week court trial. The Court has carefully considered all of the trial testimony and exhibits, the entire pretrial record, the parties' post-trial findings of fact and conclusions of law and the parties' post-trial briefing. Based on

this review, the Court finds the patent claims-in-suit invalid. The Court further finds that, with the exception of two machines, one sold and one not sold, the claims-in-suit are not infringed, either literally or under the doctrine of equivalents, by the accused machines.

### FINDINGS OF FACT[1]

### I. PARTIES AND CLAIMS

1. The plaintiff, Nordberg Inc. ("Nordberg"), is a Delaware corporation with its principal place of business located in Milwaukee, Wisconsin. Nordberg manufactures and sells machinery used in mining and mineral aggregate production. This machinery includes rock crushers, which form the subject matter of the patent in suit. (Nordberg Findings of Fact ("NFOF") at ¶¶ 1, 3; Telsmith Findings of Fact ("TFOF") at ¶ 1; Trial Transcript ("TT"), Vol. 1 at 13–14.)

2. The defendant, Telsmith, Inc. ("Telsmith"), is a Delaware corporation with its principal place of business located in Mequon, Wisconsin. Telsmith also manufactures and sells machinery used in mining and mineral aggregate production, including rock crushers. (NFOF at ¶¶ 2, 5; TFOF at ¶ 2; TT, Vol. 2 at 289–90.)

3. Nordberg and Telsmith are among four major manufacturers competing in the market for conical crushers. Nordberg has been in the market since the 1920's and is the number one supplier of cone crushers in the world with over 16,000 installations worldwide. (NFOF at ¶¶ 5–6; TT, Vol. 4 at 622, 632–637, 676, Vol. 8 at 1539.)

4. Nordberg is the owner, by assignment, of United States Patent No. 4,478,373, entitled "Conical Crusher", issued on October 23, 1984 ("the 373 Patent"). (NFOF at ¶ 4; TFOF at ¶ 3.) Nordberg also owns Reexamination Certificate B1 4,478,373, which issued on January 30, 1990 and involved a reexami-

---

1. When citing to the record, the Court sometimes cites directly to a specific exhibit or transcript, sometimes to a specific finding proposed by one or both of the parties, and sometimes to both. When the Court cites to a specific proposed finding, it incorporates the citations to the record contained in that finding. In all instances, the Court's citations are not necessarily meant to be exhaustive. All of the Court's findings are based on and supported by its review of the entire record as a whole. The specific citations, however, provide a general explanation for the Court's conclusions herein.

nation of the original 373 Patent. (NFOF at ¶ 4; TFOF at ¶ 3.)

5. Nordberg contends that certain conical crushers manufactured or developed by Telsmith infringe (or contributorily infringe) upon claims 8–11 and 13 of the 373 Patent. These crushers include Telsmith's 1100F, the "10" series, and models 52, 57 and 84. (TFOF at ¶ 4.)

## II. HISTORY AND GENERAL OPERA-TION OF CONICAL CRUSHERS

6. Conical crushers have existed since the early 1900's. (TFOF at ¶ 5.) They are primarily used in the mining industry to extract minerals from rock and in the aggregate industry to crush rock into various sizes for construction purposes. (TT, Vol. 1 at 14.) This suit involves crushers used for the latter purpose.

7. Conical crushers generally comprise a cylindrical and stationary lower frame assembly which encloses a gyrating conical head (138).[2] (NFOF at ¶ 7; TFOF at ¶ 5; TT, Vol. 1 at 15–16.) Above the lower frame assembly is an upper frame assembly which can move vertically relative to the lower frame. (NFOF at ¶ 7; TFOF at ¶ 5; TT, Vol. 1 at 15–19.) The upper frame includes a concave bowl (126) surrounding the conical head and a hopper (116) with a central opening to allow the entry of rock. (NFOF at ¶ 7; TFOF at ¶ 5; TT, Vol. 1 at 16.) The rock drops through the hopper into the space between the bowl and the conical head, which is called the crushing cavity. (Id.) Crushing results from the gyratory motion of the head. (NFOF at ¶ 7; TFOF at ¶ 5; TT, Vol. 1 at 16–17.) That is, the access of the head is mounted at a slight angle to the access of the machine. (NFOF at ¶ 7; TT, Vol. 1 at 16.) Because of this slanted access, the crushing cavity, as the head rotates, is narrow at one point on the circumference of the bowl and wider at another point. (NFOF at ¶ 7; TT, Vol. 1 at 16–17.) These two points can be referred to as the "closed" and "open" points of the crushing gap, respectively. (Id.) As

the head rotates, the closed and open points similarly rotate around the crushing cavity. (Id.) Rock dropping into the crushing cavity is squeezed between the rotating head and the bowl at various points along the circumference of the bowl. (Id.) The squeezing action crushes the rock into a smaller size generally consistent with the size of the gap in the crushing cavity at the point at which the rock is struck. (TT, Vol. 1 at 16–17, 22–23.) This all happens very quickly. In a typical crusher, the head will complete 4–6 full rotations a second. (NFOF at ¶ 7; TT, Vol. 1 at 17.) The falling rock is typically struck 3–4 times before passing through the crushing cavity. (TT, Vol. 1 at 17.)

8. In order to crush rock, the movable upper frame containing the concave bowl must be held or "biased" against the lower frame. (NFOF at ¶ 8; TFOF at ¶ 5.) Tremendous forces are required to hold the frames together against the resistance forces exerted by the rock. (NFOF at ¶ 8; TT, Vol. 1 at 21.) The hold down force ranges from approximately 300,000 pounds of spring force for a small crusher to 1.2 million pounds for a large crusher. (Id.)

9. Although the upper frame is held against the lower frame during normal crushing, conical crushers typically have provisions allowing the upper frame to raise relative to the lower frame during three basic functions: adjustment, tramp relief and clearing. (NFOF at ¶ 9; TT, Vol. 1 at 22–24.)

10. Adjustment relates to setting the vertical distance between the head and the bowl at the relatively closed gap on the gyrational cycle of the head. (NFOF at ¶ 9; TT, Vol. 1 at 22–23.) That distance determines the size of the crushed rock product. (Id.) In order to control and/or vary the size of the product, conical crushers must have some way of adjusting the distance between the head and the bowl. (Id.) Even if a consistently-sized product is desired, the head must continually be lowered to accommodate for normal wear of the crushing elements. (Id.)

---

**2.** Exhibit 1 is a copy of the 373 Patent. The Court attaches Figure 1 of Exhibit 1 to this opinion as Appendix A to assist the reader in visualizing the general operation of conical crushers. The numbers in parentheses above generally correspond to the numbers and corresponding components in Figure 1.

11. Tramp relief relates to the passing of uncrushable material. During the mining or quarrying of rock, large pieces of uncrushable material, such as steel or metal tools, often become inadvertently mixed in with the rock to be crushed. (NFOF at ¶ 10; TFOF at ¶ 6; TT, Vol. 1 at 24–25.) This material is called tramp. (Id.) If a piece of tramp enters a rock crusher and is larger than the setting of the relatively closed gap between the head and bowl, it will become caught in the crushing cavity. (Id.) The crusher will continually try to crush the tramp, which it cannot do. (Id.) If the upper frame was rigidly held against the lower frame at this point, extreme overstresses would develop and damage the crusher. (Id.) Thus, all conical crushers provide means for the upper frame to yield and raise under the pressures exerted by uncrushable tramp. (Id.) That "means", whatever form it may take, is generally referred to as "tramp relief" or "tramp release".

12. Clearing relates to removing jammed material from a stalled or shut down crusher. Occasionally, a crusher will stall or experience a power failure during crushing. (NFOF at ¶ 11; TT, Vol. 1 at 27–28.) In such cases, the crusher shuts down with a full load of rock in the crushing cavity. (Id.) Some of this rock becomes jammed or "pinched" in the cavity. (Id.) The crusher will not restart in that condition because the electric motor which powers the crusher is not strong enough to overcome the forces exerted by the jammed rock in the crushing cavity. (Id.) The rock must first be cleared from the crushing cavity. (Id.) Depending on the type of crusher involved, clearing is either done manually, with picks and crowbars, or mechanically, through some means of raising the upper frame so that the jammed rock may fall through. (Id.)

13. Another important feature in many conical crushers is an "abutting relationship" between the upper and lower frames during normal operation, created by the abutment of complementary beveled U-shaped surfaces on each frame. (NFOF at ¶ 20; TFOF at ¶ 12.) The abutment provides a positive, mechanical reference point for the crusher setting and for the return of the upper frame to a fixed operating position upon the passage of tramp material or the clearing of the crusher. (Id.) The abutting relationship has been well known in the crusher art for decades. (Id.)

14. Until the early-to-mid 70's, the most prevalent and traditional means for biasing the upper frame against the lower frame and for tramp release was the use of coiled springs. (NFOF at ¶ 12; TFOF at ¶ 7.) In spring crushers, the springs are mounted and precompressed between the frames so that the upper frame is biased toward the lower frame during normal crushing. (Id.) When tramp material enters the crushing cavity, it raises the upper frame relative to the lower frame, further compressing the springs. (Id.) The upward travel of the upper frame temporarily creates a larger crushing cavity, allowing the tramp material to pass without damaging the crusher. (Id.) Once the tramp passes, the springs expand and thereby lower the upper frame into its original position. (Id.)

15. The major disadvantage with spring crushers is that springs cannot be used to clear a stalled crusher. (NFOF at ¶ 14; TFOF at ¶ 7.) A stalled spring crusher must be cleared manually with picks and crowbars, which is a process that can take hours to complete. (Id.; TT, Vol. 1 at 27–28.) Such downtime means lost production for the crusher user. Another disadvantage is the hazardous nature of large, compressed steel springs. Due to the possibility of entire springs or parts of broken springs being released at high speeds and causing injury, such springs create safety problems for assembly, operating and maintenance personnel. (NFOF at ¶ 13; TFOF at ¶ 7.) A third disadvantage is that springs add a significant amount of weight to the crusher, which is an important factor for customers desiring a portable crusher that can be moved between job sites. (Id.)

16. Another biasing means known in the crusher art since the 50's is the use of single-acting hydraulic or pneumatic cylinders. (NFOF at ¶ 15; TFOF at ¶ 8.) Like springs, single-acting cylinders are generally mounted between the upper and lower frames. (Id.) Single-acting hydraulic cylinders have one of

two chambers of the cylinder pressurized with oil and single-acting pneumatic cylinders have one of two chambers pressurized with air. (Id.) The pressurized end biases the upper frame toward the lower frame during normal crushing. (Id.) During tramp release, the pressures created by the tramp raise the upper frame, displacing the oil in hydraulic cylinders into a corresponding accumulator and/or compressing the air in pneumatic cylinders. (Id.; see also, NFOF at ¶ 17.) After the tramp passes, the decrease in pressure causes the displaced oil to return to the pressurized end of the hydraulic cylinders and/or allows the air to decompress in the pressurized end of the pneumatic cylinders, thereby lowering the upper frame to its original position. (Id.) Like spring crushers, the major disadvantage of single-acting cylinders is that they do not provide a means for automatic clearing. (NFOF at ¶ 15; TFOF at ¶ 8.)

17. A third biasing means known in the crusher art since the late–60's or mid–70's is the use of double-acting hydraulic or pneumatic cylinders. (NFOF at ¶ 16; TFOF at ¶ 9.) Like springs and single-acting cylinders, double-acting cylinders are generally mounted between the upper and lower frames. (Id.) Unlike single-acting cylinders, however, double-acting cylinders pressurize both chambers of the hydraulic cylinders with oil and both chambers of the pneumatic cylinders with air, the chamber above the piston being the "rod end" and the chamber below the piston being the "blind end". (Id.) During normal crushing, the rod end is pressurized in order to bias the upper frame against the lower frame. (Id.) During tramp release, the upper frame is raised by the tramp, displacing the oil from the rod end of the hydraulic cylinders and/or compressing the air in the rod end of the pneumatic cylinders, similar to tramp relief using single-acting cylinders. (NFOF at ¶ 16; TFOF at ¶ 10.) To clear the crusher, however, oil is mechanically directed into the blind end of the hydraulic cylinders at the same time that oil is displaced from the rod end of such cylinders, and/or air is mechanically directed into the blind end of pneumatic cylinders at the same time that air is further compressed in the rod end of such cylinders.

(NFOF at ¶ 16; TFOF at ¶ 11.) The oil or air in the blind end raises and suspends the upper frame to allow the rock in the crushing cavity to fall through. (Id.) After the cavity is cleared, the oil or air in the blind ends of these cylinders is allowed to exit, thereby allowing oil to return to, or the air to decompress in, the rod end of the cylinders, causing the upper frame to lower and return to its crushing position. (Id.)

18. Prior to the mid–70's, conical crushers with double-acting hydraulic cylinders often "floated" the upper frame relative to the lower by adjusting the amount of hydraulic fluid both above and below the pistons, thus lacking the normal "abutting relationship" between the upper and lower frames and preventing the operator from accurately maintaining a uniform setting of the crushing gap. (NFOF at ¶¶ 18–19.)

19. As suggested by their simultaneous usage and development in the crusher art, hydraulic and pneumatic cylinder systems—though different in their respective components and manner of operation—were considered to be interchangeable biasing and release means before the invention of the 373 Patent. (TFOF at ¶ 113; TT, Vol. 12 at 2244–2245; Ex. 8, Col. 7, Line 55—Col. 8, Line 23 [Gruender].) This is not to say that one does not have advantages over the other. The most significant disadvantage with pneumatic cylinders is that they use a compressible fluid, normally air, which operates much like a spring and thus poses similar safety concerns because of the significant pressures involved. (NFOF at ¶ 17.) Pneumatic cylinders also offer less control over component movement because compressed air is not as precise a force as oil. (Id.) Pneumatic cylinders are also larger than hydraulic cylinders and may take longer to complete tramp release than hydraulic cylinders. (Id.) Nevertheless, the two types of cylinders were interchangeable and indeed the very differences discussed above—particularly the safety factor—suggested to one of ordinary skill in the art the substitution of hydraulic cylinders for pneumatic. (TFOF at ¶ 114; TT, Vol. 1 at 102–104, Vol. 6 at 1130, Vol. 12 at 2245.)

## III. SPECIFIC PRIOR ART

### A. Cited To PTO During Initial Prosecution.[3]

#### 1. Telsmith 1100E.

20. The Telsmith 1100E crusher was a conventional spring-type conical crusher having coil springs for tramp relief and upper and lower frames abutting at complimentary beveled surfaces. The crusher did not have a mechanical means for clearing the machine. It has been sold by Telsmith since at least 1974. (NFOF at ¶¶ 179–181.)

#### 2. El Jay/Cedarapids.

21. The El Jay/Cedarapids Rollercone has been on the market since the 1950's and is still sold. The Rollercone has single-acting hydraulic cylinders with normally pressurized upper chambers to bias the upper frame into an abutting relationship with the lower frame during normal crushing. The abutment is created by complementary beveled surfaces. The upper chambers of the cylinders are closely coupled to, and in fluid communication with, an accumulator which receives fluid displaced from the upper chambers during tramp relief. Initially, it appears the Rollercone had no mechanism for clearing the machine, but El Jay recently added a separate hydraulic jack to perform clearing. (NFOF at ¶¶ 190–196; TFOF at ¶¶ 100–108.)

### B. Cited During Reexamination.

22. On June 6, 1989, Nordberg filed a Request for Reexamination of the 373 Patent in light of three patents that were not cited during the initial prosecution: UK Patent 801,091 to Wedag ("the 091 Patent"), U.S. Patent No. 3,604,640 to Webster ("Webster"), and U.S. Patent No. 4,615,491 to Batch et. al. ("Batch"). (NFOF at ¶ 81.) Nordberg admitted in its request that "[t]hese prior art patents . . . raise a substantial new question of patentability with regard to at least claim 8 of Gieschen". (Ex. 4 at 3154.)

#### 1. The 091 Patent.

23. The 091 Patent was particularly relevant because it contained the features which Gieschen had argued were missing in the prior art during the initial prosecution, i.e., double acting hydraulic cylinders providing both tramp relief and clearing. (NFOF at ¶ 82; Ex. 4 at 3384–85.) Nordberg distinguished the 091 Patent, however, by its lack of an abutting relationship between the upper and lower frames. (NFOF at ¶ 82; Ex. 4 at 3384–86.)

#### 2. Webster.

24. Similarly, Webster disclosed double-acting hydraulic cylinders. (NFOF at ¶ 82; Ex. 4 at 3386–87.) While these cylinders provided for mechanical clearing, it appears coil springs were used for tramp relief and there was no abutting relationship between the upper and lower frames. (Id.; see also, Ex. 4 at 3156–58.)

#### 3. Batch.

25. Batch disclosed a conical crusher with double acting hydraulic cylinders used for tramp relief and clearing *and* which had the abutting relationship between the upper and lower frames. (NFOF at ¶ 83.) Gholz, Nordberg's legal expert, admitted at trial that Batch poses a serious threat to the validity of the 373 Patent if it is considered prior art. (TT, Vol. 5 at 921.) Nordberg distinguished Batch, however, under a 35 U.S.C. § 131 Declaration by Gieschen establishing conception prior to the Batch patent filing date of October 15, 1979. (NFOF at ¶ 83; Ex. 4 at 3387–88; see also, COL at ¶ 48.)

### C. Never Cited To PTO.

#### 1. Saunders.

26. The Saunders patent is a Nordberg patent that was issued in 1964 and which was not before the Examiner during the prosecution of the 373 Patent or the reexamination. (NFOF at ¶ 146; TFOF at ¶¶ 34–35.)

27. Saunders was a Nordberg employee. (TT, Vol. 1 at 96–7.) John Gieschen, the

---

**3.** The Court will not discuss every piece of prior art cited to the Examiner, but will rather limit its discussion to those items of prior art discussed by Telsmith.

inventor of the 373 Patent, knew Saunders, whom he remembered as primarily a grinding mill designer, but did not become aware of Saunders' work on crusher designs or of the existence of the Saunders patent until a few weeks before trial. (Id.; see also, NFOF at ¶ 146.)

28. Like the 373 Patent, Saunders discloses a conical crusher with a stationary lower frame assembly and a vertically movable upper frame assembly which is biased towards or held against the lower frame. (TT, Vol. 2 at 236–37, Vol. 3 at 436.) It discloses a crusher head assembly mounted on a support means for gyratory motion relative to the frame assemblies. (TT, Vol. 2 at 236–37, Vol. 3 at 437.) It discloses an adjustable bowl mounted to the upper frame for vertical movement relative to the frame and head assemblies. (Id.) It discloses an eccentric means for imparting gyratory motion to the crusher head and a drive means for driving the eccentric means. (Id.) It has hydraulic cylinders, one end of which are pressurized in a normally operating crusher mode to exert a hydraulic biasing force to hold said frame assemblies together in abutting relationship.[4] It has a normally pressurized accumulator in fluid communication with one end of said cylinders. (TT, Vol. 2 at 239–40, Vol. 3 at 444.) It is unclear, however, whether Saunders discloses a release means including biasing means and lifting means connected to said upper and lower frames for releasably biasing said upper frame into an abutting relationship with said lower frame, said release means comprising a plurality of double acting hydraulic cylinders.[5] (TT, Vol. 2 at 237–38.) Saunders is

4. Russell Henke, Nordberg's hydraulics expert, claimed this element is not met in Saunders because it is the coil springs which provide the hold-down force. (TT, Vol. 3 at 444.) Saunders, however, teaches that, absent the hydraulic forces at issue, the coil springs would "elongate from their load-working length to their contained-length where they exercise no holddown force." (Ex. 575, Col. 4 at Lines 31–32.) Thus, it is clearly the hydraulics which provide the biasing force necessary to create the abutting relationship.

5. Although Nordberg's Gieschen and one of Telsmith's hydraulics experts, Herbert Jakob, both agreed that this element in the 373 Patent is met in Saunders, Henke did not. (TT, Vol. 3 at 437–41.) As the Court understands it, the "release means" described in the 373 Patent is a "plurality of hydraulic cylinders" that accomplish two functions: Tramp relief and clearing. Tramp relief is the function described by the claim language "for releasably biasing said upper frame into an abutting relationship with said lower frame". Clearing is the function described by the claim language discussing a "first signal" and a "second signal". While Saunders clearly teaches that its hydraulic cylinders provide the means for clearing, and also—through the springs—the initial hold-down force for the abutting relationship, the dispute centers on whether the cylinders are involved in the tramp relief function, i.e., whether they "releasably bias[]" said upper frame into an abutting relationship with said lower frame". Henke claims that Saunders performs tramp relief solely through compression of the springs, with no movement of the hydraulic cylinders. If the cylinders do not move, they do not releasably bias.

Saunders is unclear on this point. On one hand, the specification contains several statements supporting Gieschen and Jakob's view.

For example, after describing one purpose of the invention as hydraulic clearing, Saunders states that "[a]nother purpose is a hydraulic release for cone crushers or the like which yieldingly holds or mounts the bowl on the crusher frame." (Ex. 575 at Col. 1, Lines 16–18.) Elsewhere it states that "[t]he invention includes a fluid system which is used both to hold the bowl ring to the crusher frame and to release the bowl ring and bowl from the crusher frame. In particular, a high pressure fluid is normally supplied to a plurality of jacks which are circumferentially arranged around the crusher. The jacks are effective to hold the bowl ring yieldingly to the crusher frame through the spring assemblies." (Id., Col. 3, Lines 72–75—Col. 4, Lines 1–4.) More importantly, Saunders states that, during tramp relief, "the crusher may be stopped by the increase in pressure applied to the fluid in chamber 106." (Id., Col. 2, Lines 72—Col. 3, Lines 1–2.) Jakob considers the latter statement critical, because the only way the pressure in chamber 106 can increase is if the cylinder moves, and if it moves, it is releasably biasing. (TT, Vol. 6 at 1111–18.)

On the other hand, there are also several statements supporting Henke's view that only the springs move during tramp relief. For example, the specification states that "[t]he springs 90 and 94 permit relative movement between the upper and lower plates during normal operation, which allows for extra hard rock. When uncrushable material, such as tramp iron or other uncrushable objects become caught in the crushing cavity, the springs will become further compressed as the lower plates are drawn upward by bolts 64. Such uncrushable material will raise the bowl ring and bowl, which through bolts 64 raise each lower plate to compress the springs, as shown at the left hand side of FIGURE 6." (Id., Col. 2, Lines 62–72.) As even Jakob had to admit, the

also unclear as to whether fluid is displaced from the hydraulic cylinder to the accumulator during tramp relief.[6] Saunders does not have a single signal that simultaneously deactivates said biasing means and activates said lifting means, or vice versa.[7] (TT, Vol. 3 at 441–42.) And while the hydraulic pistons are connected to one of said frame assemblies, the hydraulic cylinders are not connected to the other of said frame assemblies.[8]

left hand side of FIGURE 6 in Saunders, which is supposed to show the cylinders and springs in tramp relief position, shows no movement of the cylinder. (TT, Vol. 6 at 1143–46.) Elsewhere it is stated that "[t]he above described spring and jack system, in the normal use of the crusher, holds the bowl in its predetermined position or setting by holding the adjustment ring 48 downwardly against the conic surface 44 of the top flange 40. The springs are available for release in the event that uncrushable material enters the above-defined crushing cavity." (Id., Col. 3, Lines 39–46.) Lastly, Saunders teaches that, "[u]nder normal operating conditions, the bowl and bowl ring are yieldingly held to the crusher frame by the spring assemblies. When uncrushable material becomes trapped in the crushing cavity, the bowl and bowl liner move upward against the force or springs 90 and 94." (Id., Col. 4, Lines 45–51.)

As discussed later in this opinion, the dispute is critical to the question of whether the 373 Patent is invalid as anticipated by Saunders. For purposes of the Court's analysis, the 373 patent is presumed valid. (COL at ¶ 3.) Telsmith has the burden of proving invalidity by clear and convincing evidence. (COL at ¶ 4.) Factual inferences and conclusions relied upon in making a claim of invalidity must also be proven by clear and convincing evidence. (Id.) Anticipation is shown only if all of the claims of a given invention are shown in a single prior art reference. (COL at ¶ 11.) Whether a specific element of an invention is disclosed within a piece of prior art must be shown by clear and convincing evidence. (COL at ¶ 12.) Because of the higher standard, the Court cannot concur with Jakob and Telsmith's interpretation of Saunders. While the Court sees the logic in Jakob's position, the language of the specification contradicts it in several respects, as shown above. Other language is consistent with Jakob, but this creates—at best—a stalemate on the issue, which is not enough to overcome the presumption of validity. Even if logic slightly favors Jakob's position, it would not be enough to satisfy the requirement of clear and convincing evidence.

6. This point turns on the same factual question discussed in the preceding footnote, *i.e.*, if the hydraulic cylinder moves during tramp relief it will increase the pressure in chamber 106 and force fluid out of the cylinder, presumably *into* the accumulator. Jakob argued that this had to happen because the cylinder/accumulator combination acts as a gas spring in series with the coiled spring. (TT, Vol. 6 at 1145–46.) Theoretically, when two springs are in series, force applied to one spring will have some calculable effect upon the other spring. (Id.) If the second spring has a far greater mass than the first, as Henke and Gieschen described to be the case in Saunders, the effect may be negligible and may only be measurable on a calculator with plenty of zeros, but it is calculable. (Id.) Moreover, Telsmith argues that Henke and Gieschen are making certain baseless assumptions about the respective sizes or mass of the coil and gas springs in Saunders.

The Court finds several problems with Telsmith's and Jakob's positions on this point. First, Henke's and Gieschen's assumptions were not baseless. Gieschen was relying upon his familiarity with the typical dimensions of a SYMONS cone at the time of the Saunders invention and both could point to the fact that FIGURE 6 of the Saunders patent showed no visible movement of the hydraulic cylinder during tramp relief, a depiction explained only by the possibility that the gas spring presented a far greater mass than the coil spring. Second, the burden to show movement of the cylinder is on Telsmith, not Nordberg, and that movement must be shown by clear and convincing evidence. In light of FIGURE 6, this burden required Telsmith, not Nordberg, to come forward with evidence regarding the size of the gas and coil springs in Saunders. Third, even accepting Jakob's testimony that some movement—no matter how minuscule—must theoretically occur, it would not necessarily mean that the purpose of the accumulator in the Saunders circuit is to receive fluid displaced from the cylinder during tramp relief. If the movement of oil during tramp relief can only be shown on a calculator with plenty of zeros, as FIGURE 6 suggests, it seems unlikely that the purpose of the accumulator was to accommodate such movement. If that was not its purpose, the 373 Patent does not read on Saunders.

7. Gieschen testified that this element was met in Saunders, but without any underlying discussion. (TT, Vol. 2 at 238.) Henke's testimony makes it clear that the valves designated in Saunders are not the type of valves needed to provide a single signal means for accomplishing the two tasks. (TT, Vol. 3 at 441–42.)

8. Henke testified that the cylinders in Saunders are not directly connected to either frame assembly and essentially "float" within the two points where the pistons bottom out on either the rod end or blind end of the cylinders, respectively. (TT, Vol. 3 at 442–43.) Gieschen said the cylinders were "connected" to the lower frame through the springs. (TT, Vol. 2 at 239.) The Court does not read the word "connected" so

#### 2. Jeffrey/Wedag crusher.

29. In 1962, Robert Stafford, Telsmith's current president, was an engineer for Jeffrey Manufacturing Co. in Columbus, Ohio ("Jeffrey"). (TT, Vol. 6 at 1162; NFOF at ¶ 127.) Jeffrey had obtained a license to manufacture, for sale in the U.S., a cone crusher developed by a German company known under the acronym Wedag, located in Bochum, West Germany.[9] (TT, Vol. 6 at 1165–66; NFOF at ¶ 127.) Wedag had sold several of the licensed cone crushers, but none in the U.S. (TT, Vol. 10 at 1813–14; NFOF at ¶ 128.) In 1962, Stafford was given the task of converting the licensed Wedag drawings, which were written in German with metric dimensions, to the English language and English dimensions. (TT, Vol. 6 at 1165–66; NFOF at ¶ 129.) The conversion process took approximately one year. (Id.)

30. The Wedag crusher was basically a conical crusher in which the upper frame was held in relation to the lower frame by eight double acting hydraulic cylinders. (TT, Vol. 6 at 1168, 1171–75; NFOF at ¶ 130.) The crusher did not provide a bevelled seat between the upper and lower frames. (TT, Vol. 7 at 1287–88; NFOF at ¶ 130.) Instead, eight horizontally oriented shock absorbers or snubbers maintained the position of the upper frame in the horizontal plane. (TT, Vol. 6 at 1168, 1171–75; NFOF at ¶ 130.) The double acting hydraulic cylinders maintained the position of the upper frame in the vertical plane. (Id.)

31. The Jeffrey/Wedag crusher did not have "an adjustable bowl mounted to said upper frame assembly for vertical movement relative to said frame assemblies and head assembly".[10] Moreover, it is unclear whether the release means in the Jeffrey crusher "releasably bias[ ] said upper frame into an abutting relationship with said lower frame".[11] It is also unclear whether the

broadly. In the 373 Patent, the connection is fixed, such that a piston is joined to one frame assembly and a cylinder is joined to the other. The connection forces the pistons and cylinders to move in sync with their respective assemblies, if at all. In Saunders, the connection is simply one surface indirectly touching or meeting another through a third intervening surface, *i.e.*, a spring, which is itself only touching or meeting the two surfaces it is supposedly connecting. There is no fixed joinder of these surfaces in Saunders. As a result, it may be possible that a cylinder moves in relation to the lower frame in Saunders, but it certainly does not move in sync therewith through a formal connection.

9. The Jeffrey crusher was not cited to the PTO at any point in the process, but the tramp release and clearing mechanism is based on and substantially identical to the 091 patent, which was cited to the Examiner during the reexamination. (NFOF at ¶ 174.)

10. Telsmith disputes this point. Stafford initially testified that the Jeffrey crusher had this feature. (TT, Vol. 7 at 1284.) His position was seriously weakened on cross-examination, however. (TT, Vol. 10 at 1873–78.) On cross, Stafford had to admit that the concave bowl or liner in Jeffrey did not, for adjustment purposes, move vertically with respect to the upper and lower frame assemblies, as called for in the 373 Patent. (Id.) Rather, when adjustment was desired on the Jeffrey crusher, the entire upper portion or mass of the crusher—including the concave bowl or liner, the upper frame and the eyebolt connected to the piston—was raised or lowered as a unit relative to the head assembly. (Id.; see also, TT,

Vol. 6 at 1177–78.) This explanation describes an adjustable upper frame or upper frame assembly, not an adjustable bowl. Charles Witherspoon, Telsmith's own legal expert, admitted this fact and concluded therefrom that the Jeffrey crusher did not contain this element of the 373 Patent. (TT, Vol. 11 at 2075.) Telsmith tries to resuscitate its position via an "admission" contained in Nordberg's reexamination petition that the 091 Patent meets this requirement for an adjustable bowl. (TFOF at ¶ 47.) The 091 Patent is considered identical to the Jeffrey/Wedag crusher in this regard. (Id.) Whatever indirect position Nordberg may have taken on an unlitigated issue before the PTO, that position—like Telsmith's—was shown to be contrary to the clear and convincing evidence brought to light during trial.

11. This matter was hotly disputed. The dispute turns on the definition of the word "abutting". It is clear that the upper and lower frames in the Jeffrey crusher did not "abut" the way they do in the 373 Patent, *i.e.*, they did not touch or lie against each other in a bevelled seat. They were not even directly adjacent to each other. Nonetheless, Stafford claimed that an abutting relationship existed. He claimed that, during normal operation, the pistons in the double acting cylinders "bottomed out", creating a fixed reference point to which the upper frame—through the eyebolt and piston—would always return after tramp relief or clearing. (TT, Vol. 6 at 1179–82, 1292–94; Ex. 313.) Stafford's theory is essentially that Jeffrey's upper frame "abutted" the lower frame because the upper frame was at-

accumulator received fluid displaced from the cylinder during tramp relief.[12]

**3. Wedag brochure.**

32. A 1961 brochure published by Wedag teaches the same type of conical crusher as

tached to an eyebolt, which was connected to a piston, which bottomed out on a cylinder, which was connected to an eyebolt, which was attached to the lower frame. (Id.)

Witherspoon, Telsmith's legal expert, agreed that such indirect contact constituted an abutment because (1) *Claim 13 of the 373 patent adds the limitation that the bevelled surfaces are "in contact with each other"*, implying that the word "abutting" in Claim 8 does not require direct contact; (2) the purpose of the abutting relationship is to establish a fixed reference point for the upper frame, and Jeffrey's "abutment" did that; and (3) the pistons and cylinders can be included as components of the upper and lower frame assemblies, respectively, such that a direct abutment is established. (TT, Vol. 11 at 2075–77.)

*Even assuming that the pistons in Jeffrey bottomed out during normal operation*—an assumption not without its own problems (see, TT, Vol. 10 at 1841–1850)—there are several weaknesses in the foregoing position. First, it offends the commonly understood meaning of the word "abut". Webster's defines the term as "to touch at one end or side of something" and "to border on: adjoin". *Webster's II New Riverside University Dictionary.* American Heritage mirrors this definition and also adds to "lie adjacent" and "be next to". *The American Heritage Dictionary (2nd College Edition).* The "abutment" Stafford describes clearly does not meet these definitions. Moreover, while the language of Claim 13 is certainly relevant on this point, its impact is not entirely clear. The Court reads the claim as adding the limitation of "bevelled" surfaces to the concept of an "abutting relationship", such that the phrase "in contact with each other" could be construed as a restatement or clarification of the term "abutting", rather than a further limitation itself. Such a clarification would be consistent with Claim 8's subsequent language describing a hydraulic force "to hold said frame assemblies *together* in abutting relationship". Even if Claim 13 suggests that the "abutting relationship" in Claim 8 does not require "contact", it certainly does not imply that any physical relationship wherein one structure is indirectly connected to another constitutes an abutment. It's like arguing that the thigh bone "abuts" the collar bone simply because a skeleton is a single structure comprising interconnected parts. Such a definition guts all meaning from the term "abutting" and is not how one of ordinary skill in the art would interpret it. This is further amplified by Witherspoon's argument that the purpose of the abutting relationship was to provide a fixed reference point for the upper frame to return to after tramp relief or clearing. In the context of the 373 Patent, a "fixed" reference point implies metal-to-metal contact which, according to the language of the patent, must be between the upper and lower frames. The pistons and cylinders cannot be considered part of the upper and lower frames, for purposes of

establishing the metal-to-metal contact, because Claim 8 identifies them as separate components, *i.e.*, "said cylinders connected to one of said frame assemblies and said pistons connected to the other of said frame assemblies".

Given these weaknesses, Telsmith has not *proved by clear and convincing evidence that the Jeffrey crusher contained this element of the 373 Patent.*

12. The dispute centers around a memo written by Stafford on January 25, 1979 in which he describes the operation of the Jeffrey hydraulic circuit to Telsmith engineers designing Telsmith's first hydraulic tramp relief system. (Ex. 541.) In that memo, Stafford states that the oil displaced during tramp relief is sent to tank, not to the accumulator:

> When an uncrushable enters the crushing chamber, the relief valve (No. 19) is exceeded, due to the incompressible tramp iron, which wants to raise the support bowl; *this forces the oil out the top of this cylinder over the relief valve, into the tank.* As the crusher rotates, obviously it will keep hitting the tramp iron, or incompressible object, hence every time it hits it, it will raise the cylinder or cylinders at that location. *Oil is constantly dumped over the relief valve,* and as the eccentric goes to the low side, the accumulator very rapidly forces oil onto the rod side of the cylinder and pulls the bowl back down to its normal location. This sequence is repeated as many times as required for the machine to pass the tramp iron.

(Ex. 541; emphasis supplied.) At trial, however, Stafford testified that oil *was* displaced into the accumulator during tramp relief. (TT, Vol. 7 at 1285, Vol. 10 at 1827–28.) When confronted with the foregoing language of his previous memo, Stafford offered the following explanation:

A: Well, I think the reason that its describing it different is because we had been talking about incorporating relief valves in the Telsmith circuit, additional relief valves in the Telsmith circuit. And I used number 19 to explain how the relief valves, I guess, was going to work.

\* \* \* \* \* \*

Q: Well, if you really wanted to make your point, why *didn't you say there was going to be a bunch of relief valves up by the cylinders? Why didn't you say that?*

A: I don't know why I said what I said January 25, 1979.

(TT, Vol. 10 at 1839–41.) This explanation is troubling. The Court fails to see how the memo clarified or highlighted the role of the additional relief valves. Stafford's explanation for why the memo does not say what it says does not present "clear and convincing evidence" that displaced *oil was sent to the accumulator during tramp relief in the Jeffrey crusher.*

the one developed by Jeffrey, *i.e.*, one with double-acting hydraulic cylinders to perform both tramp relief and clearing. As explained above, however, it is unclear whether the upper frame has an "abutting relationship" with the lower frame during normal crushing. (FOF at ¶ 31.) It is also unclear whether the cylinders are in fluid communication with the accumulator during tramp relief. (Id.; see also, NFOF at ¶¶ 205–207; TFOF at ¶¶ 117–121.)

#### 4. Bjarme.

33. The Bjarme '571 patent was issued June 8, 1954 and discloses a conical crusher having double-acting pneumatic cylinders to perform both tramp relief and clearing. During normal crushing, the normally pressurized upper chambers of the cylinders bias the upper frame against the lower frame in an abutting relationship. (NFOF at ¶¶ 197–204; TFOF at ¶¶ 109–116.)

### IV. DEVELOPMENT OF MODEL B AND 1100F

34. With this general history and prior art in mind, we turn to Nordberg's development of the invention at issue and the relatively simultaneous development by Telsmith of similar technology. Nordberg's efforts were embodied in a project called the Model B. Telsmith's efforts were embodied in a project called the 1100F. Both projects involved the development of a conical rock crusher using double-acting hydraulic cylinders to perform both tramp release and clearing and to bias the upper frame against the lower frame in an abutting relationship.

#### A. Nordberg's Model B.

35. In the early 1970's, Nordberg management made a decision to develop a new crusher to replace or modernize Nordberg's SYMONS conical crusher, which had been a very successful product but which was beginning to lose market share to newer crushers developed by Nordberg's competitors. (NFOF at ¶ 32–33; Ex. 120; TT, Vol. 1 at 47–49.) John Gieschen, a Nordberg engineer, was appointed to head the "Model B" project, and in February of 1974 he outlined management's basic design objectives. (Id.) These included, among others, low manufacturing cost, low height and weight configuration for greater portability, ease of field maintenance, and mechanisms for adjustment, tramp relief and clearing. (Id.) At this stage there was no requirement that the latter mechanisms be hydraulic, spring-based or pneumatic—just that they be mechanical for greater ease and speed. (TT, Vol. 1 at 47–48.) There was also no express reference to the need for an abutting relationship between the upper and lower frames of the crusher. (Ex. 120.) Instead, management authorized an "inside out" approach, which allowed Gieschen and his design team to start from scratch and build whatever type of crusher they thought best, regardless of whether it incorporated features from Nordberg's existing crushers and for which tooling was already available. (NFOF at ¶ 33; Ex. 120; TT, Vol. 1 at 50–51.)

36. In keeping with the foregoing design objectives, particularly the specified weight and cost reductions, Gieschen and his team would often use lower cost but unproven ideas, relying on eventual prototype testing to reveal any deficiencies. (NFOF at ¶ 34; Ex. 123 at 405; TT, Vol. 1 at 54–55.) Indeed, in the design and development of any new crusher, extensive testing under commercial conditions is necessary to prove the crusher's durability and commercial viability. (NFOF at ¶ 35; TT, Vol. 1 at 71, Vol. 4 at 599.) Development of the Model B progressed with the expectation of such testing in mind. (NFOF ·at ¶ 35; TT, Vol. 1 at 54–55.)

37. The consideration of many potential mechanisms for tramp relief, clearing and adjustment began as early as February, 1974. (NFOF at ¶¶ 36–37; Ex. 120.) It was recognized early on that the clearing feature could be combined with the same mechanism as the adjustment or tramp relief features. (Exs. 121, 122; TT, Vol. 1 at 56–7.) Gieschen considered every possible combination of features that would do the job, including hydraulic, pneumatic and spring-based systems. (NFOF at ¶ 37; TT, Vol. 1 at 60; Ex. 126.) A mechanism very similar to the double-acting hydraulic system eventually chosen

was first drawn, along with various other options, in September of 1974. (NFOF at ¶ 37; Ex. 126; TT, Vol. 1 at 58–9.)

38. The final tramp relief and clearing system was selected in February, 1977, based upon an analysis performed by T. Braun. (Ex. 124.) Under that analysis, the various systems conceptualized in 1974 were narrowed down to a group of twelve, again including hydraulic, pneumatic and spring-based systems. (NFOF at ¶ 38; Ex. 124; TT, Vol. 1 at 60–61.) The twelve were compared in terms of their relative cost and weight. (Ex. 124; TT, Vol. 1 at 61–2.) In a meeting on or around February 10, 1977, Nordberg selected Version 3, originally drawn in September, 1974, and which employed the hydraulic tramp release and clearing configuration found in the 373 Patent. (Ex. 124; NFOF at ¶ 38; TT, Vol. 1 at 61–2, 65.)

39. The conception of the entire Model B for design purposes occurred by April 25, 1977. (NFOF at ¶ 39; TT, Vol. 1 at 66; Ex. 66.) On May 2, 1977, at a meeting of Nordberg marketing and engineering personnel, Gieschen presented the design of the Model B and described its operation. Drawings of the crusher were disclosed and discussed. (NFOF at ¶ 40; TT, Vol. 1 at 52–53, 59; Exs. 66, 123.) The presentation included a discussion of the construction and the operation of the hydraulic tramp release and clearing system. (NFOF at ¶ 41; Ex. 123; TT, Vol. 13 at 2399–2405.) At this time, Gieschen already had a general idea as to how the hydraulic circuit would be constructed and had drafts of such a circuit drawn up, but none of the drafts could be produced for trial. (TT, Vol. 1 at 65–66, 157.) Gieschen's testimony is supported, however, by Uhle Sawant, a participant at the May 2, 1977 meeting, and by the printed minutes of that meeting, both of which relate the extensive amount of detail provided regarding the types, dimensional characteristics and loading of the various components of the hydraulic tramp release and clearing system, indicating that the design of the hydraulic tramp release and clearing system was generally complete.[13] (NFOF at ¶ 41; Ex. 123; TT, Vol. 13 at 2399–2405.)

40. Detailed manufacturing drawings were prepared for the Model B in the summer of 1978 and the initial assembly of the prototype crusher was completed in January, 1979. (NFOF at ¶ 42; Ex. 4, Bates 3189; Exs. 284, 288; TT, Vol. 1 at 62–70.) Upon assembly of the Model B prototype, a three-stage testing program was developed, beginning with no-load shop tests, progressing to short-term crushing at Nordberg's Test Center, and finishing with field tests at an actual production site. (NFOF at ¶¶ 43–45; TT, Vol. 1 at 66–72, Vol. 2 at 252–56, Vol. 3 at 568–70, Vol. 13 at 2393–99; Exs. 62, 64, 73.) Numerous strain gauges were attached to the machine during each phase of testing to monitor the machine. (Id.) The no-load shop tests, beginning in January, 1979, focused on testing the machine's lubrication system. (Id.) The clearing mechanism was

---

**13.** Telsmith seizes upon the lack of schematic drawings showing the proposed hydraulic circuit as evidence that conception of the entire patented invention was not yet complete. Telsmith draws attention to Gieschen's declaration submitted during the reexamination proceedings, wherein he states that, while "[a] proposed overall structure for the Omnicone was adopted in about May, 1977", "final" technical drawings of the overall structure were not completed until June, 1978 and "finalized" technical drawings of the hydraulic circuit were not completed until October of 1978. (Ex 4, Bates 3189.) Telsmith suggests that this establishes October '78 as the date of conception. The Court disagrees. "Conception" requires possession of every feature of the invention and proof by corroborating evidence that the inventor disclosed to others a completed thought in such clear terms as to enable those skilled in the art to make the inven-

tion. (NCOL 88.) Conception is wholly distinct from reduction to practice since conception is the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention. (Id.) While an inventor's testimony regarding conception must be supported with corroborating evidence (NCOL 89), Gieschen's testimony in this regard is corroborated by the detailed disclosures contained in Ex. 123 and by Sawant's testimony regarding the completeness of the design disclosed by Gieschen at the May 2, 1977 meeting. Gieschen's declaration that "final" drawings were not completed until June and October of 1978 is not necessarily inconsistent with his testimony that he had a definite and permanent idea of the complete and operative invention in May of 1977 and that preliminary drawings existed at that time reflecting the idea.

satisfactorily tested during both the shop tests and the test center tests, at one point placing a steel block in the crushing cavity and creating conditions comparable to a plugged crusher. (Id.) Actual crushing was performed at the test center in April and May of 1979. (Id.) Because of limited space and equipment, the crushing runs were of short duration and used relatively soft limestone, but the runs were intended to show whether "crushing would actually be accomplished." (Id.) The tramp mechanism was also tested at the test center by feeding tramp material into the crushing cavity under no-load conditions. (Id.) After completion of the test center tests on or around June 1, 1979, Gieschen concluded that the Model B was "workable for its intended purpose" and he reiterated that opinion during trial. (TT, Vol. 2 at 187–88; TFOF at ¶ 89.)

41. Shop tests and the tests at the test center did not, however, prove the long-term reliability and commercial viability of the new crusher. (NFOF at ¶ 46; TT, Vol. 1 at 71–72, Vol. 3 at 580–81, Vol. 7 at 1227–28, Vol. 13 at 2413–16, 2451; TFOF at ¶ 90.) This can only be determined by relatively long-term field tests under commercial conditions. (Id.) Even after a new crusher enters the market, Nordberg continues to monitor it for several years in order to determine its reliability. (TT, Vol. 13 at 2416.)

42. Nordberg arranged to conduct field tests at a commercial plant in Phoenix, Arizona owned by The Tanner Companies ("Tanner"). (NFOF at ¶ 48.) An agreement outlining the terms and conditions of the field test was executed in August, 1979. (Id.; Ex. 129.) Among other things, the agreement provided that the Model B remained the property of Nordberg and that Nordberg would have control over the operation of the Model B throughout the field test. (NFOF at ¶¶ 48–49; Ex. 129.) It also provided that Tanner and Nordberg employees would have "free and unlimited access to the test crusher at all times" and that visits by third parties "[were] to be discouraged" and only made when mutually agreeable to both Tanner and Nordberg. (NFOF at ¶ 50; Ex. 129.) The agreement did not impose any obligation of secrecy or confidentiality upon Tanner or its employees regarding the Model B or its use at the facility.[14] (Ex. 129.)

43. Because of the nature of the operation, Tanner's plant was in a relatively wide open location. (TT, Vol. 10 at 1749–55.) There were no special barriers erected around the Model B. (Id.) The quarry itself was enclosed by a fence that had a gate which was open during the daytime. (Id.) There was little to no control over who came in and out of the quarry. (TT, Vol. 2 at 189–90.) The road from the main gate led past the Model B and anybody who drove down the road could see the Model B in operation. (TT, Vol. 10 at 1749–55.) Indeed, it was the relatively open and uncontrolled nature of such plants that prompted Nordberg to request a provision in the test agreement discouraging third-party visits. (TT, Vol. 2 at 189–90.) Gieschen himself virtually lived at the Tanner facility and made efforts, to the extent possible, to keep third parties away from the Model B, especially during the early months of testing. (TT, Vol. 13 at 2339–52.) Yet, despite this contractual provision and Gieschen's efforts, Nordberg's own internal memoranda indicate that there was relatively "free visiting" by various dealer personnel early on, a fact confirmed by Nielson in his testimony.[15] (Ex. 606; TT, Vol. 10 at 1748–55.)

---

14. Gieschen testified that he thought there was a second agreement between Nordberg and Tanner imposing such obligations, or that at least it was Nordberg's normal practice to have such a confidentiality agreement and he assumes they followed that practice in the Tanner testing. (TT, Vol 1 at 164–65.) Gieschen never saw a copy of the alleged agreement, however. (Id.) Anthony Magerowski, another Nordberg employee involved in the testing at Tanner, could not verify that such an agreement was actually negotiated and signed between Nordberg and Tanner. (TT, Vol. 4 at 593–94.) Moreover, Gary Nielson, a Tanner employee involved in the negotiations over the test agreement, disclaimed any knowledge of a confidentiality agreement and no such agreement has ever been produced during this litigation. (TT, Vol 1 at 164–65, Vol. 10 at 1747–48, 1754–55.)

15. The memorandum at issue, dated November 1, 1979, expressed a concern that the relatively open location near the airport and the free visits by dealer personnel could raise patentability problems in "absolute novelty" countries and warranted the initiation of a patent application.

44. The initial agreement made no mention of the crusher being offered for sale to Tanner or of any "try-buy" arrangement between Nordberg and Tanner. (Ex. 129.) To the contrary, the agreement expressly provided that the crusher would be removed from the plant at the conclusion of the field tests. (Id.) However, Nielson testified that he understood from the beginning that Tanner would be able to purchase the Model B at the conclusion of the field tests if it so desired. (TFOF at ¶ 93; TT, Vol. 10 at 1752–53.)

45. The Model B was set up at the Tanner facility in September, 1979 and the field tests began on September 24, 1979. (NFOF at ¶¶ 48, 51; Ex. 76.) Strain gauge tests and stress tests were performed on all of the major systems of the Model B. (NFOF at ¶ 54; Ex. 76.) This initial round of field tests was completed in May, 1980 and established the durability and commercial viability of the machine. (TT, Vol. 1 at 77–9; Ex. 75.) However, on April 25, 1980, Nordberg and Tanner executed an amendment to the initial testing agreement extending the testing period to September, 1980 and turning control and use of the Model B over to Tanner. (NFOF at ¶ 55; TT, Vol. 1 at 74–5; Ex. 130.) The amended agreement also gave Tanner a first option to purchase the Model B at the conclusion of the test period. (NFOF at ¶ 55; Ex. 130.) This is the first and only documentary proof of any "try-buy" arrangement between Tanner and Nordberg with respect to the Model B. All other terms and conditions of the initial test agreement, not altered by the amendment, remained in full force and effect. (Ex. 130.)

46. As a result of the field tests at Tanner, Nordberg made some minor changes to the Model B's hydraulics which were eventually incorporated into the commercial Omnicone crushers that embodied the claimed invention. (NFOF at ¶ 59.) Although Tanner decided against purchasing the Model B at the conclusion of the field tests, Nordberg management was convinced of the crusher's commercial viability and began preparing a patent application, which was filed on October 14, 1980. (NFOF at ¶¶ 21, 61.) Nordberg did not disclose the use of the Model B at the Tanner facility in its patent application or at any point during the initial prosecution. (TFOF at ¶ 168.) Nordberg made reference to the Tanner use in a declaration filed during the reexamination, but the declaration was submitted to antedate the Batch patent (FOF at ¶ 25) and not to disclose the potential public use of the Model B. (TFOF at ¶ 168.)

**B. Telsmith's 1100F.**

47. Robert Stafford, Telsmith's current president, was employed by Jeffrey Manufacturing ("Jeffrey") for 16 years before joining Telsmith in May, 1978. (TFOF at ¶ 58.) As discussed earlier, while at Jeffrey, Stafford was responsible for the manufacture and evaluation of a new crusher, under a license from a foreign manufacturer in Germany, which employed double-acting hydraulic cylinders to perform both tramp release and clearing. (TFOF at ¶ 58; FOF at ¶¶ 29–31.) Shortly before joining Telsmith in May, 1978, Stafford had the idea of combining the double-acting hydraulic cylinders and hydraulic circuit from the Jeffrey crusher with Telsmith's 1100E crusher, which used coil springs for tramp relief and had no mechanism for clearing. (TFOF at ¶¶ 58–59; FOF at ¶ 20.) There is no evidence that Stafford was aware of Nordberg's Model B project at this time.[16] (TT, Vol. 5 at 936–37.)

(Ex. 606.) The memo raises no such concerns about patentability in the United States, perhaps because it was the author's belief that "a confidentiality exists between ourselves and Tanner". (Id.) It is unclear why the author had this belief. He did not testify at trial. Nordberg argues that the memo suggests the existence of a separate confidentiality agreement, but it is equally plausible that the author was simply referring to the provision in the test agreement discouraging third-party visits. Given the confusion, and absent a copy of the alleged agreement, the Court cannot find that such an agreement ever existed.

16. Nordberg seems to suggest that Stafford and Telsmith may have had information regarding the Model B when it was developing the 1100F and thus may have copied the Model B. Nordberg's basis for this insinuation is that Bill Gray, a former Nordberg employee, left Nordberg in 1978 to work for Telsmith. (NFOF at ¶¶ 221–22.) There is no evidence, however, that Gray ever discussed the Model B with Stafford. (TT,

48. Immediately after joining Telsmith, Stafford circulated a June 27, 1978 memo reiterating his idea and attaching a copy of the Jeffrey hydraulic circuit and a brief description of how it worked. (TFOF at ¶ 59; NFOF at ¶ 116; Ex. 537.) The memo did not provide any other details of the proposed crusher and did not describe or depict how the hydraulic system would be mounted or connected to the crusher. (Id.) The new crusher was given the name "1100F". (Id.)

49. The necessary design details and design drawings of the hydraulic circuit for the 1100F were finalized by December 18, 1978. (NFOF at ¶ 118; TFOF at ¶ 61.) Manufacturing drawings were completed by the spring of 1979 and fabrication began immediately thereafter. (TFOF at ¶ 62.) Assembly of the 1100F was completed in June, 1979 and shop-tested in early July, 1979. (NFOF at ¶ 119; TFOF at ¶¶ 67–68.) The shop testing consisted of throwing chunks of tramp material such as wood and metal into the crusher to determine if the hydraulic relief system worked. (Id.) The clearing function was also tested at this time. (NFOF at ¶ 119.) The crusher operated satisfactorily and Stafford was convinced that it would work for its intended purpose. (TFOF at ¶ 68.) As designed, assembled and tested, the 1100F clearly contained all of the elements and limitations of the claims-in-suit.[17] (TT, Vol. 8 at 1544–47.)

50. After the shop tests, in September, 1979, Telsmith held its "Agtec '79" seminar in Lincolnshire, Illinois. (NFOF at ¶ 107; TFOF at ¶ 70.) "Agtec" is an annual seminar sponsored by Telsmith and attended by Telsmith dealers and sales personnel. (Id.) Admission to Agtec seminars was by invitation only and the attendees were a select group of Telsmith employees and top producing dealers. (NFOF at ¶ 107.)

51. It is clear that the 1100F was described in detail at Agtec '79. (NFOF at ¶ 108; TFOF at ¶ 70.) It is also clear that many of the attendees, including many of the dealer representatives, visited Telsmith's plant in Milwaukee after the conference and saw demonstrations of the 1100F. (NFOF at ¶¶ 108, 112; TFOF at ¶ 71.) The demonstrations focused on the tramp relief and clearing mechanisms; no rock was actually run through the machine. (Id.) None of the dealers or the Telsmith employees in attendance were under any obligation of secrecy. (TFOF at ¶¶ 70–71.)

52. Most of the attendees who testified at trial stated that they believed and understood that the 1100F was on sale. (NFOF at ¶ 108; TFOF at ¶ 72.) One attendee stated in a deposition, however, that the machine was not ready for sale because it had not been tested in the field and that the only reason the 1100F was discussed and demonstrated was to introduce it as a machine that would be available some time in the future. (NFOF at ¶ 110.) None of the attendees testified that they approached a customer or solicited orders prior to the critical date of October 14, 1979. (NFOF at ¶ 108.) Telsmith produced no brochures or other materials from this time frame promoting the new crusher or soliciting orders for the same. (Flora Dep. at 26.) In fact, a handout distributed at the seminar merely refers to the machine as a "pilot model crusher" being assembled on the erection floor and yet to be tested in the field. It does not give any

---

Vol. 11 at 2002.) None of the contemporaneous documents discussing the 1100F make any reference to the Model B or the possibility that Nordberg was designing a similar device. And Stafford certainly can point to his prior experience at Jeffrey as giving him the idea for the 1100F.

17. Nordberg tried to create some doubt as to whether the 1100F actually reads on the 373 Patent. Nordberg argues that Stafford initially testified at trial that the Batch patent application, filed by Stafford and Joe Batch—another Telsmith engineer—in 1979, reflected the 1100F design. (NFOF at ¶¶ 237–244.) Stafford changed this testimony when it was pointed out to him

that the Batch application shows the circuit as using a solenoid-operated two position directional valve for the hydraulic tramp relief and clearing mechanism, as opposed to the manual directional valve used in the 373 Patent. (Id.) Stafford's revised testimony is confirmed, however, by Nordberg's own interrogatory answers, which lists the 1100F as an infringing device, and by Gieschen's own drawing of the 1100F circuit after inspecting the same at the Southern Ready Mix plant in Calera, Alabama, which drawing shows the manual directional valve. (TT, Vol. 8 at 1550–51, Vol. 12 at 2191–93; Ex. 568.)

indication that the machine was for sale or even encourage the attendees to seek orders for the same:

*1100 "F" Style Gyrasphere*—The objective of this program was to provide an automatic adjusting feature while crushing, and incorporate a system through the use of hydraulics, which will permit the machine to pass tramp iron during the crushing operation.

The automatic adjusting feature will utilize pneumatics for releasing the upper frame assembly and a modified version of our current power rotator will provide the means of rotating. Hydraulic cylinders, replacing the coil springs, will provide the downward force on the upper frame assembly during the crushing cycle and also serve as a tramp iron release mechanism.

To achieve the above objectives, a pilot model crusher was built and is now being assembled on our erection floor. After extensive testing in our shop, plans have been initiated to field test the crusher at a local sand and gravel installation.

(Ex. 572–A.) The only written notice to Telsmith dealers announcing the availability of the 1100F and encouraging the solicitation of prospective buyers was dated April 23, 1980, well after the critical date of October 14, 1979. (Ex. 564.)

53. In May, 1979, prior to the Agtec conference, James Stibor of Telsmith approached Peter Clemmons of Crystal Lake Stone ("Crystal Lake") about the possibility of placing the 1100F in Crystal Lake's quarry for a field test. (NFOF at ¶ 97; TFOF at ¶ 65.) An agreement was reached and confirmed in a May 24, 1979 letter from Stibor to Clemmons. (Id.; Ex. 553.) The agreement referred to the 1100F as a "test machine" and an "experimental crusher". (Ex. 553.) However, the parties understood the field test to be a "try-buy" arrangement wherein, at the end of the field test, Clemmons could trade in his old 1100E and buy the 1100F if he was satisfied with its performance. (NFOF at ¶¶ 97, 99; TFOF at ¶¶ 65–66.) Although a specific price for the 1100F was not discussed at any time prior to the field test, Telsmith promised Clemmons

that he would be offered a "good deal" on any purchase. (NFOF at ¶¶ 97, 99.)

54. Although the agreement was reached in May, 1979, the 1100F was not delivered to Crystal Lake until early November, 1979, which is after the critical date of October 14, 1979. (NFOF at ¶ 101; TFOF at ¶ 73.) The field test lasted only 3–4 weeks. (TT, Vol. 10 at 1780.) The 1100F tested well and Crystal Lake was satisfied with its performance. (TT, Vol. 10 at 1781–82, 1795–98.) Jake Smith of Telsmith then formulated a price for the 1100F on January 10, 1980. (NFOF at ¶ 100.) Clemmons decided against purchasing the machine, however, primarily because the asking price was too high. (NFOF at ¶ 102; TFOF at ¶ 73.)

55. After the Crystal Lake field test, Telsmith determined that more field testing was necessary before going into full production and therefore sought another location to place the 1100F for field tests. (Ex. 564.) Telsmith wanted the operator to agree to purchase the machine up front, however, with payments extended over the duration of the field test. (Id.) No such buyer was found and the 1100F sat in Telsmith's inventory from 1979 until it was sold to an Alabama customer in 1983 or 1984. (NFOF at ¶ 104; TFOF at ¶ 75.) Telsmith never made another 1100F and did not commercially introduce the 1310—another, modified hydraulic crusher—until 1987. (NFOF at ¶ 105.)

## V. PROSECUTION HISTORY OF 373 PATENT

56. As stated earlier, after the successful field testing of the Model B, Nordberg was confident of its commercial viability and filed a patent application. Gieschen's original patent application was filed on October 14, 1980 and was assigned to Rexnord (Nordberg's predecessor, hereinafter "Nordberg") during prosecution. The application contained 31 claims, of which only five are at issue in the present lawsuit, *i.e.*, claims 8–11 and 13. These claims were originally filed as application claims 19–25. Gieschen described these claims as providing a tramp release function as well as a clearing function, which operate in combination with a mechanical seat for positive positioning upon passage of tramp

material (the abutting relationship). (NFOF at ¶ 69.)

57. On November 23, 1981, Gieschen filed a Preliminary Amendment for the purpose of correcting typographical errors, and a Publication Statement in which he disclosed to the PTO several prior art patents (Polzin, Gilbert, Davis '759, Gasparac '342, Davis '760, Johnson, Gasparac '774, Szaj, Symons and Werginz) and a publication (Pegson–Telsmith Autocone Brochure). (NFOF at ¶ 71.)

58. On July 2, 1982, the Examiner issued an Official Action in which, among other things, claims 16 and 19–25 were rejected as being anticipated by, or obvious in view of, Gruender, a prior art patent. (NFOF at ¶ 72; Ex. 3 at 3089–92, 3098.) It was odd for the Examiner to group claim 16, which relates to a ram assembly mechanism for adjusting the bowl, with claims 19–25, which relate to the hydraulic tramp relief and clearing system. (TT, Vol. 4 at 738–39, 748–50.) In any event, Gruender discloses a conical crusher having single acting pneumatic cylinders for tramp release, but no mechanism for clearing. (NFOF at ¶ 73.) The Examiner reasoned that "[t]he exact manner in which the bowl is rotated and the exact manner in which the tramp release means is operated are both seen to be obvious matters of choice and structural design." (Ex. 3 at 3098.)

59. On November 2, 1982, Gieschen filed an Amendment in response to the Examiner's rejection, in which claim 19 (now claim 8) was amended to include specific references to the clearing function ("lifting means") and claim 20 (also now claim 8) was amended to elaborate on the abutting relationship and to include the language regarding at least one accumulator to receive fluid displaced during tramp relief. (NFOF at ¶ 74.) Gieschen argued that no prior art, including Gruender, either alone or in combination, used double acting hydraulic cylinders to provide tramp release and clearing and the abutting relationship:

Claim 19 calls for a crusher characterized by a release means which biases the upper and lower frames in an abutting relationship and allows the upper and lower frames to separate vertically to allow passage of tramp material through the crushing cavity. In addition, claim 19 has been amended to further restrict the release means to a double acting hydraulic cylinder which can be pressurized on the side opposite the tramp release side to raise the upper frame member off its seat to permit the crusher cavity to be cleared of jammed material. Gruender does not show a double acting cylinder which biases the upper frame against the lower frame in abutting relationship and then lifts the upper frame off the lower frame to permit the passage of jammed material. Neither does any other prior art of record in this application and, to applicant's knowledge, this arrangement is absolutely novel and unobvious. It produces a particularly effective and efficient use of the structure by performing multiple functions with the same apparatus merely by use of various hydraulic connections and valving. It makes possible the automatic operation of the clearing function and also prevents the loss of hydraulic pressure when the tramp release mechanism is operating. It permits a very accurate indexing of the upper and lower frames by the abutting relationship and separates the wear compensation function which is performed by the adjusting ram separately so that the hydraulic system is not asked to control the spacing between the crushing surfaces in normal operations. In the circumstances, it would appear that claim 19 is patentable over Gruender and any other prior art of record in this application either alone or in combination.

(TFOF at ¶ 15; Ex. 3 at 3130–31.)

60. In a second Official Action, dated January 26, 1983, the Examiner rejected claims 16 and 18–25 as being obvious in view of a combination of Gruender and Kueneman et. al. (NFOF at ¶ 76.) Kueneman, another prior art patent, was cited for disclosing a crusher bowl adjustment mechanism. (Id.) The Examiner reasoned that "[i]t would be obvious in view of Kueneman et al to modify the Gruender device by providing a ram assembly for adjusting the bowl, and to provide the bowl with an annular surface having spaced abutments for contact with the ram assembly. The exact construction and opera-

tion of the ram assembly are seen to be obvious matters of choice and structural design." (Ex. 3 at 3151.) In this the Examiner focused entirely on the adjustment mechanism of the crusher, detailed in application claims 16–18, which clearly had nothing to do with the hydraulic system detailed in application claims 19–25. (TT, Vol. 4 at 748–50.) Nothing in the Examiner's remarks related to the hydraulic system at all. (Id.) Charles Gholz, Nordberg's legal expert at trial, described this omission as "bizarre" and the Court agrees. (Id.) One must conclude that the Examiner was either very confused or simply did not understand the claims-in-suit.

61. On July 26, 1983, Gieschen filed another amendment in response to the second rejection. The claims-in-suit were not amended. Rather, in the remarks section, Gieschen emphasized the fact that Gruender did not provide a clearing mechanism:

> Claim 19 and claims 1, 2, 27, 28, 33, 34, and 35 are all directed to a crusher having upper and lower frame assemblies which are biased into abutting relationship by release means and which can be forcibly separated by the release means to clear the crusher of jammed material. The reference relied upon to show the subject matter is Gruender, however, Gruender does not disclose a clearing function. Gruender's piston and cylinder 214 and 213 are merely for the purpose of tramp release and are incapable of lifting the upper bowl assembly for clearing.... Since there is no prior art in the file or anywhere else known to Applicant which does meet these claim limitations and there is nothing in the prior art identified by the Examiner or known to the Applicant which would make the claimed combinations obvious to one skilled in the art at the time the invention was made, these claims should be allowable.

(NFOF at ¶ 77; Ex. 3 at 3171–72.) Gieschen's remarks in this regard may not have been entirely forthcoming. That is, Gieschen states that nothing in the prior art of record disclosed double acting hydraulic cylinders that performed both tramp release and clearing. This is not true. The Autocone brochure, cited by Gieschen in his Publication Statement, employed double acting cylinders, coupled with an accumulator, for both tramp release and clearing. (Ex. 3 at 3092; TT, Vol. 5 at 915–19; Ex. 4 at 3354–65; TFOF at ¶ 18.) The Autocone did not provide the abutting relationship between the two upper frames (Ex. 3 at 3092), but that was not the focus of Gieschen's remarks above. In any event, neither Gieschen nor the Examiner ever discussed the Autocone brochure in the context of the claims-in-suit which, given its greater relevance than Gruender (which had single acting pneumatic cylinders and no clearing mechanism), is further evidence of the Examiner's confusion.

62. On October 20, 1983, the Examiner issued a third and final Official Action in which the rejection of claims 16, 18–22, 25 and 35 was reiterated on the same confused grounds as before. (NFOF at ¶ 78; Ex. 3 at 3181; TT, Vol. 4 at 755–57.)

63. On February 6, 1984, Gieschen appealed this final action to the Board of Appeals and, in particularly strong language, pointed out the Examiner's confusion regarding the claims-in-suit and the Gruender and Kueneman patents:

> Claim 19 calls for release means for biasing the crusher bowl against the frame for tramp release, and having lifting means connected between the upper and lower frames responsive to a first signal for deactivating the biasing means and activating the lifting means for lifting the upper frame away from the lower frame to permit the clearing of jammed material, and responsive to a second signal for activating the biasing means and deactivating the lifting means. This subject matter relates to the tramp release and crusher clearing system which is the double acting hydraulic cylinders 68 and the control system as shown in Figure 12 of the drawings.
>
> Claim 19 has been rejected on the combination of Gruender and Kueneman. Kueneman teaches a conventional spring biased tramp release system and a crusher cavity adjusting mechanism which rotates the bowl in the helical threads in the adjustment ring to control the gap of the crushing cavity. Gruender shows a pneumatic tramp release scheme which, essen-

tially, is a gas spring, that is, a pneumatic equivalent of the spring release system shown in Kueneman. Neither Kueneman nor Gruender teach any of the structure set forth in the characterizing clause in Claim 19. In particular, they do not show an [sic] lifting means connected to the lower and upper frames for releasably biasing the upper frame into abutting relationship with the lower frame and responsive to a first signal for deactivating the biasing means and activating lifting means for lifting the upper frame away from the lower frame to permit the clearing of jammed material, and responsive to a second signal for activating the biasing means and deactivating the lifting means. *In short, the citation of references applied against the claim does not anticipate or make obvious one single word of the characterizing clause.*

Applicant has carefully examined the two references for some interpretation which would have some relationship to the subject matter claimed in Claim 19 but can find nothing. *The explanations set forth by the Examiner have no relation whatsoever to the subject matter. Applicant is utterly at a loss as to how to respond to this rejection since the references have a total absence of a biasing and lifting means which can be used as both a tramp release and a crusher clearing system.* (NFOF at ¶ 79; Ex. 3 at 3218–3219.) (Emphasis supplied.)

64. Upon reviewing these arguments, the Examiner contacted Gieschen's attorney by telephone and indicated that application claim 19 would be allowable if it incorporated the features of application claim 20. (NFOF at ¶ 80; Ex. 3 at 3229.) There is no indication how this proposed amendment addressed the Examiner's prior objections. There is no explanation as to why this relatively minor change suddenly made the claims-in-suit patentable. In any event, Gieschen made the required changes and the patent issued on October 23, 1984. (NFOF at ¶ 80.)

65. As indicated earlier, Nordberg filed a Request for Reexamination of the claims-in-suit on June 6, 1989 in light of the 091,

Webster and Batch patents. (Ex. 4 at 3154.) On January 30, 1990, the PTO issued a reexamination certificate for the 373 Patent, accepting Nordberg's arguments distinguishing these three patents and stating that all of the claims were patentable as originally granted. (NFOF at ¶ 22.)

## VI. CLAIMS–IN–SUIT AND OPERATION OF 373 PATENT

66. As issued, the 373 Patent discloses a conical rock crusher having various features. However, for purposes of this suit, the technology at issue is the patent's hydraulic tramp relief and clearing system. Specifically, the 373 Patent discloses double-acting hydraulic cylinders and pistons for both tramp relief and clearing. During normal crushing, these hydraulics also exert a hydraulic biasing force holding the upper and lower frames together in an abutting relationship. The abutment is created by complementary beveled surfaces. According to Nordberg, performing these three functions, *i.e.,* tramp relief, clearing and the abutting relationship, by means of a single hydraulic system, was Gieschen's patentable advance or improvement over the prior art. Of the 27 total claims, this advance is disclosed in claims 8–11 and 13, hereinafter referred to as the "claims-in-suit". (NFOF at ¶¶ 23–31, 64; TT, Vol. 3 at 489–90, Vol. 4 at 745–46.)

67. Independent claim 8 of the 373 Patent reads as follows:

A crusher of the conical type having a stationary lower frame assembly, a vertically movable upper frame assembly biased toward said lower frame assembly, a head assembly including a crusher head mounted on a support means for gyratory motion relative to said frame assemblies, an adjustable bowl mounted to said upper frame assembly for vertical movement relative to said frame assemblies and head assembly and eccentric means for imparting gyratory motion to said head, and a drive means for driving said eccentric means, said crusher characterized by release means including biasing means and lifting means connected to said lower and upper frames for releasably biasing said upper frame into an abutting relationship

with said lower frame and responsive to a first signal for deactivating said biasing means and activating said lifting means for lifting said upper frame away from said lower frame to permit the clearing of jammed material, and responsive to a second signal for activating said biasing means and deactivating said lifting means; said release means comprising a plurality of double acting hydraulic cylinders and pistons, said cylinders connected to one of said frame assemblies and said pistons connected to the other of said frame assemblies, one end of said cylinders being pressurized in a normally operating crushing mode to exert a hydraulic biasing force to hold said frame assemblies together in abutting relationship, and further including at least one normally pressurized accumulator in fluid communication with said one end of said cylinders to receive fluid displaced from said cylinder when tramp material passes through the crushing cavity between said head and said bowl.

(NFOF at ¶¶ 24–27; Ex. 1.)

68. Dependent claim 9 of the 373 Patent reads as follows:

The crusher of claim 8 in which said piston is connected directly to the upper frame assembly and is biased downwardly by hydraulic pressure within said cylinder above said piston.

(NFOF at ¶ 28; Ex. 1.)

69. Dependent claim 10 of the 373 Patent reads as follows:

The crusher of claim 8 in which said one end of said cylinder communicates with said accumulator and, through a selectively movable valve, selectively with a hydraulic fluid reservoir and a hydraulic pressure source to vent said one end in a clearing mode for vertical separation of said frame assemblies, and to pressurize said one end in a normal crushing mode to bias said frame assemblies into abutting relationship, and the other end of said cylinder is

selectively connected through said valve to said hydraulic pressure source in said clearing mode to lift said upper frame assembly away from said lower frame assembly, and to said reservoir in said normal crushing mode.

(NFOF at ¶ 29; Ex. 1.)

70. Dependent claim 11 of the 373 Patent reads as follows:

The crusher of claim 10 in which said valve means comprises a 4–way, 3–position valve for selectively connecting the two ends of said cylinder with said source of hydraulic fluid pressure and said reservoir.

(NFOF at ¶ 30; Ex. 1.)

71. Dependent claim 13 of the 373 Patent reads as follows:

The crusher of claim 8, wherein said lower frame assembly includes an annular shell having an upper portion which terminates in a ring seat having a beveled upper surface; said upper frame assembly includes a ring having a beveled lower surface corresponding to said ring seat upper beveled surface, said biasing means normally holding said ring against said seat with said beveled surfaces in contact with each other.

(NFOF at ¶ 31; Ex. 1.)

72. The Court will not describe every facet of the operation of the 373 Patent. Rather, the Court will focus on the hydraulic tramp relief and clearing mechanism disclosed above, and specifically the hydraulic circuit used in that mechanism, as these matters are the focus of the parties' dispute on the infringement issue.[18]

73. To operate the crusher, one first has to charge the hydraulic circuit. (TT, Vol. 1 at 33–42; Ex. 601–G.) To charge the circuit, the gas-filled bladder contained in the accumulator 90 is charged to the desired pressure. (Id.) Then the pump 268 is started and causes oil to flow over line 236 until it reaches the valve 226, which is referred to as

---

18. A drawing of that portion of the 373 circuit pertaining to tramp release and clearing was submitted as Exhibit 601–G and is attached hereto as Appendix B as a visual aid of the circuit's operation. (Ex. 601–G.) The Court has made handwritten corrections on two of the numbered components of the circuit, consistent with corrections that were made during the trial. (TT, Vol. 1 at 31–3.) The numbers referenced by the Court above correspond to the numbers and corresponding components on Appendix B.

a 4–way 3–position valve. (Id.) Where the oil goes at that point depends upon the position of that valve. (Id.) When charging the circuit, the valve is shifted to the left and placed in the "crossover" position. (Id.) In this position the oil in line 236 enters valve 226, crosses over into line 224 and flows through that line and line 222 and fills chamber 218 in the cylinder 68. (Id.) As that chamber fills and oil also begins to enter the lower part of the accumulator 90, this increasing oil in combination with the gas-filled bladder in the accumulator causes the pressure in the accumulator and throughout the system to increase. (Id.) When the pressure reaches the prescribed operating pressure of 1700 p.s.i., valve 226 is shifted one position to the right and placed in the "closed" or "neutral" position, in which position no oil passes through either side of the valve. (Id.) At that point the machine is ready for normal crushing. (Id.)

74. During tramp release, the increased forces created by the presence of tramp material in the crushing cavity lift the upper frame off its bevelled seat. (Id.) This in turn raises the piston in cylinder 68, which displaces oil from the upper chamber 218—or "rod end"—of the cylinder. (Id.) The displaced oil passes through line 222 and into the accumulator 90, which provides somewhat of a cushion or "gas spring" because of the gas-filled bladder contained therein. (Id.) As the tramp is passed and the forces in the crushing cavity decrease, the higher pressures in the accumulator 90 force oil back over line 222 and into chamber 218 of cylinder 68. (Id.) As oil returns to chamber 218, the piston in cylinder 68 returns to its normal position and the upper frame returns to its bevelled seat. (Id.) The machine is now prepared to resume normal crushing. (Id.)

75. To clear the crusher after it has become stalled or jammed with rock, one first starts the pump, which is not running when the crusher is stalled. (Id.) Valve 226 is then shifted all the way to the right and placed in the "open" or "parallel" position. (Id.) This allows the oil under pressure in line 224 to pass through valve 226 and return to tank 234. (Id.) This causes the pressure

in line 224 to fall. (Id.) When the pressure gets low enough, it activates an electrical switch (represented by the two squares adjacent to the phrase "to pilot light") which in turn operates solenoid valve 232. (Id.) That causes the solenoid valve to shift to the closed position, blocking the normal flow of oil back to tank 234. (Id.) This means that the oil flowing over line 236, through valve 226 and into line 230 is now directed into line 231 and begins to fill the lower chamber 228—or "blind end"—of cylinder 68. (Id.) The continued pumping of oil in this fashion causes the piston in cylinder 68 to rise, which in turn causes the upper frame to rise. (Id.) The upper frame continues to rise until it either reaches the full limit of its travel or the operator shifts valve 226 out of the parallel position. (Id.) Once the jammed rock is completely cleared, valve 226 is shifted to the crossover position, allowing the oil in the blind end of cylinder 68 to return through lines 231 and 230 and cross over through valve 226 and back to tank 234. (Id.) At the same time, oil from line 236 is pumped through valve 226, crosses over to line 224 and continues through line 222 into the rod end of cylinder 68. (Id.) This causes the piston to lower and pulls the upper frame back to its bevelled seat. (Id.) As continued oil is pumped in this fashion, the pressure in the system increases until it reaches the prescribed operating pressure. (Id.) At that point valve 226 is shifted into the closed or neutral position and the machine is once again ready for normal crushing. (Id.)

## VII. OPERATION OF TELSMITH CIRCUIT

76. The Telsmith crushers that are alleged to infringe the 373 Patent are similar in their general design and operation. Telsmith machines employ double-acting hydraulic cylinders, in connection with a single gas-charged accumulator, to provide a mechanical means for tramp release and clearing. They also employ the abutting relationship between the upper and lower frames to provide a fixed reference point for the upper frame to return to after a tramp release or clearing operation. They differ, however, in

the design and operation of their hydraulic circuits.[19]

77. The operation of the Telsmith circuit was described by several different witnesses in several different ways. (See generally, TT, Vol. 2 at 263–80, 283–68, Vol. 3 at 448–66, 470–74, Vol. 5 at 972–1017, Vol. 6 at 1021–37, Vol. 8 at 1507–44.) For ease of explanation and comparison, however, the Court will describe the operation of the Telsmith circuit in much the same manner and chronology as it described the 373 circuit.

78. To charge the Telsmith circuit, the 4–way 3–position valve 13 is shifted to the parallel port position. (Id.; Ex. 601–A.) Oil is then directed through 2–position valve 6 and through check valve 18. (Id.) Check valves allow oil to pass through in one direction but prevent oil from passing back through in the opposite direction. (Id.) Once the oil passes through check valve 18, some travels over to the accumulator 10 and some travels upward to valve 13, which is preceded by another check valve that is not numbered in the drawing. (Id.) The oil that travels upward passes through valve 13 over port A and continues into the rod end of the double-acting hydraulic cylinder. This pushes the cylinder rod down, which in turn pulls the upper frame down to its abutment with the lower frame. (Id.) Any oil in the blind end of the cylinder is displaced through port B and travels back through valve 13 and over port T to tank. (Id.) As oil continues to be pumped in this fashion, pressure throughout the system increases as the accumulator is filled with oil. (Id.) Once the pressure reaches a certain point, the pump is automatically shut off and the oil flow is stopped. The two check valves prevent oil from backing out of the cylinders and the accumulator and normal crushing may begin. (Id.) The pressure in the system gradually drops, of course, but once it reaches a certain prescribed level the pump is automatically restarted and additional oil is pumped through the system until the desired pressure level is restored. (Id.)

79. During tramp relief, the tramp material raises the upper frame, pulling up the rod in the double-acting hydraulic cylinder. The oil in the rod end of the cylinder cannot be displaced through port A, because the check valve behind valve 13 blocks the flow of oil. (Id.) Pressure builds until it exceeds the level prescribed for the relief valve adjacent to the cylinder. (Id.) At that point the relief valve opens and the oil in the rod end of the cylinder is displaced into the blind end of the cylinder. (Id.) When the tramp passes, the upper frame begins to lower, pulling the cylinder rod down. (Id.) As the pressure drops, the relief valve closes at the prescribed level, blocking any further flow of oil into the blind end of the cylinder. (Id.) The oil in the blind end of the cylinder is displaced over port B and returned to tank through valve 13. (Id.) If the pressure throughout the system has decreased below the low pressure setting, which it probably has because of the loss of oil in the rod end of the cylinder during tramp relief, the pump is engaged and oil is sent back through the system until the high pressure setting is restored. (Id.)

80. To clear the crusher, valve 13 is shifted into the crossover position, which allows the oil in the rod end of the cylinder to cross over from port A into port T, thereby bypassing the check valve and returning to tank. (Id.) At the same time, oil from the other direction crosses over into port B and travels down into the blind end of the cylinder, causing the cylinder rod and the upper frame to rise and the jammed material to pass through. (Id.) Depending on what the system pressure is at the time, the initial oil flowing into the blind end will come from the accumulator until the low pressure setting is reached, at which point the pump will come on and the rest of the oil will be supplied from tank. (Id.) Given the size of the accumulator, however, it is fair to say that the bulk of the clearing operation is powered by oil sent from the tank. (Id.) Once the crusher is cleared, valve 13 is shifted back to

19. A drawing of that portion of the Telsmith circuit pertaining to tramp release and clearing was submitted as Exhibit 601–A and is attached hereto as Appendix C. (Ex. 601–A.) The numbers referenced by the Court above correspond to the numbers and corresponding components in Appendix C.

the parallel port position and the system is recharged. (Id.)

## VIII. TELSMITH'S SWITCH TO A CHECK VALVE

81. Obviously, the critical difference between the 373 circuit and the Telsmith circuit is the presence of the check valve in the Telsmith circuit that prevents the transfer of oil, or "fluid communication", between the cylinders and the accumulator during tramp relief. This check valve is part of the Parker 4-Way Directional Valve incorporated into the hydraulic power units used in all of Telsmith's commercial crushers. (TT, Vol. 2 at 309, 314; Ex. 208.) The identifying part number for this type of directional valve is D61VW8C6Y ("the C6Y valve"). (Ex. 208.)

82. There is a dispute between the parties as to whether Telsmith sold any crushers that do not incorporate the C6Y valve. The dispute arises because the original design of the Telsmith circuit specified a power unit that incorporated a different directional valve, identified by the part number D6V1W1C4Y ("the C4Y valve"). (TT, Vol. 2 at 290-91; Ex. 83.) The C4Y valve does not contain the critical check valve, such that a Telsmith crusher using such a valve would, like the 373 Patent, displace oil from the cylinders to the accumulator during tramp relief. (Id.)

83. Telsmith built at least two crushers that incorporated the C4Y valve: The 1100F and one Model 1310 Gyrasphere. (TT, Vol. 303-04, 319-321, 336-37; TT, Vol. 8 at 1544-47.) The 1100F was eventually sold to an aggregate plant in Alabama. (FOF at ¶ 55.) There is no evidence in the record indicating that the C4Y valve was ever replaced by a C6Y valve, either before or after the sale. The Model 1310 was sent to a trade show in February of 1987. (TT, Vol. 2 at 324.) Prior to the show, a dump valve on the machine failed during shop tests, but it was quickly replaced and sent to the show anyway. (TT,

Vol. 2 at 319.) The dump valve failed again during the show. (TT, Vol. 2 at 319-20.) When the machine was returned to Milwaukee, Telsmith decided to take the dump valve out of the circuit. (TT, Vol. 2 at 320-21.) This apparently required Telsmith to replace the C4Y valve with a C6Y valve incorporating the critical check valve. (TT, Vol. 2 at 321-25.) In order to quickly memorialize the change, James Bremer, a Telsmith engineer, used whiteout to doctor a copy of the original circuit to reflect the change. (TT, Vol. 2 at 328-32; Exs. 83 & 214.) This informal change was made immediately upon Bremer's return to Milwaukee from the trade show. (Id.) Formal changes were not made to the drawings of Telsmith's supplier, Ritter Engineering Company ("Ritter"), until January, 1988, when Bremer called Ritter and told them that the documents needed to be updated. (TT, Vol. 2 at 293-299, 316-18, 325.) Stafford, Telsmith's president, confirms Bremer's chronology of events. (TT, Vol. 3 at 405-08.)

84. Nordberg essentially asks the Court to find that Bremer and Stafford are lying with respect to the cause and the timing of the change from the C4Y valve to the C6Y valve. Nordberg argues that the change was made in late 1987 or early 1988 in an effort to design around the 373 Patent. (NFOF at ¶¶ 264-279; Nordberg Post-Trial Reply Brief at 18.) First, as proof that the change was an attempt to design around the patent, Nordberg cites three facts: (1) A highly confidential 1989 market study, commissioned by Telsmith, exploring the potential for entering the 7' crusher market, dominated by Nordberg at the time; (2) a July 15, 1988 memo authored by Stafford, discussing the possibility of competing against Nordberg in the 7' crusher market and detailing Telsmith's efforts or intentions to copy parts of the unpatented Nordberg SYMONS crusher; and (3) Telsmith's purchase of a SYMONS crusher for that very purpose.[20] (Nordberg's Brief in

---

20. The market study and the Stafford memo were not submitted during the trial of this case. They were produced by Telsmith after the trial in response to certain discovery requests submitted by Nordberg in a state court action pending between the parties. Nordberg moves the Court to reopen the record to allow the submission of these documents. Because the documents are "relevant", "admissible" and "helpful to the fact-finder" (Telsmith Brief in Opposition at 1), the Court grants the motion. Moreover, any additional evidentiary materials submitted in connection with Nordberg's motion, or Telsmith's responses thereto, are also added to the record.

Support of Motion to Reopen at Exs. 3 & 4; TT, Vol. 11 at 1943–47.) The foregoing provides no direct evidence that Telsmith designed around the 373 Patent. Nordberg argues, however, that it shows a corporate policy of copying competitive devices and a corporate desire to enter the 7′ market. Maybe so, but the Court nonetheless finds the evidence insufficient to show copying of the claims-in-suit. The market study was issued in 1989 and the Stafford memo was issued in July, 1988, both well after the timing of Telsmith's change in directional valves, even using Nordberg's alleged timeframe. Moreover, the fact that Telsmith copied parts of the SYMONS crusher, an unpatented device with no hydraulics, is not evidence that it copied the claims-in-suit. Indeed, Stafford testified that he never even heard of the 373 Patent at the time the change was made. (TT, Vol. 11 at 1996.) Second, as proof that the change occurred in late 1987 or early 1988, Nordberg focuses first on Bremer's deposition testimony, which can be read to place the timing of the change closer to the time that Ritter made the formal change to its documents. (TT, Vol. 2 at 293–99; NFOF at ¶¶ 267, 273.) Nordberg also focuses on the fact that a Ritter purchase order dated March 6, 1987, after the trade show incident, shows that Ritter ordered additional C4Y valves on Telsmith's behalf. (TT, Vol. 2 at 356–57; Ex. 262.) Taken together, Nordberg suggests this is sufficient evidence that Telsmith was using C4Y valves on the machines it manufactured during most, if not all, of 1987. The Court does not agree. While Nordberg suggests that Stafford's credibility is subject to question, no such suggestion can be made with regard to Bremer. Bremer's demeanor on the witness stand suggested to the Court that Bremer was a credible witness. More importantly, Nordberg has not come forward with a single piece of evidence of an actual crusher in the field, other than the 1100F, which incorporates a C4Y check valve. The Court flagged the importance of such evidence in its pretrial order affirming Nordberg's right to review copies of Telsmith's repair files, files which contain bills of material for every crusher shipped in 1987 and which show pre-

cisely what type of valve was used on each crusher:

> A reasonable construction of Judge Warren's decision shows that Telsmith reads too much into the disputed language, Nordberg reads too little, and in the end it does not matter. Telsmith would have the Court rule that Judge Warren's prior order assumes that 2–3 crushers without check valves **actually** exist; a more fair reading of the order is that it assumes only the **possibility** that such crushers exist and allows Nordberg the chance to explore that possibility further. Nordberg, on the other hand, would have the Court rule that Judge Warren's language was a meaningless typo and seems to argue that the record already supports a finding that such crushers exist; a more fair reading of the order is that Nordberg will eventually have to produce more direct evidence that such crushers exist before going forward with a claim of literal infringement at trial. In essence, Judge Warren ruled that it would be premature to address the viability of a literal infringement claim before Nordberg had an opportunity to follow-up on the clear inference created by the Ritter testimony, *i.e.*, that there may be some Telsmith crushers in the field without check valves. If, however, after full and free discovery, Nordberg is unable to trace the power unit(s) discussed in the Ritter testimony to actual crushers in the field, the literal infringement claim would be dismissed.

(Court's Decision and Order dated 10/29/92 at 13–14; emphasis in original.) The repair files were produced and Stafford testified regarding the same during trial. (TT, Vol. 2 at 363–83, Vol. 3 at 386–410.) The files showed that Telsmith sold and shipped nine (9) crushers with hydraulic tramp release and clearing in 1987. (TT, Vol. 2 at 363–64, Vol 3 at 403–05; Ex. 88.) The shipping dates were May 8th, May 18th, May 20th, August 14th, August 26th, September 18th, November 10th, December 17th and December 22nd. (TT, Vol. 3 at 403–05; Ex. 88.) The file for each crusher contained a bill of material for the hydraulic relief system, and each such bill contained a reference to either a 29D18 or 28S44 hydraulic power unit. (TT,

Vol. 2 at 363–64, Vol 3 at 403–05; Ex. 88 at Tabs B, D, G, I, M, P, R, T, V.) The parties stipulated that, with respect to the hydraulic tramp release and clearing functions, both the 29D18 and 28S44 power units operate the same way and both contain the internal check valve critical to this litigation. (TT, Vol. 2 at 369–70.) The repair files therefore support Bremer's and Stafford's testimony that the switch to the C6Y valve was made immediately after the February, 1987 trade show. More importantly, the repair files fail to provide any evidence tying the additional C4Y valves ordered by Ritter in March, 1987 to any Telsmith crusher in the field.

## IX. COMMERCIAL SUCCESS

85. Nordberg's Omnicone crushers, which incorporated the hydraulic tramp release and clearing features of the 373 Patent, were introduced commercially in 1981. (TT, Vol. 4 at 622–29; Ex. 156.) They did not make an immediate impact on the industry. (Id.) Indeed, only a "handful" were sold in the first four years they were offered and the majority of crushers sold by Nordberg during this timeframe were SYMONS spring crushers.[21] (TT, Vol. 4 at 625, 627.) Beginning in 1985, however, the Omnicone crusher, particularly the 1560 model, experienced a dramatic surge in popularity that lasted roughly four years and saw the Omnicone replace the SYMONS as the crusher of choice. (Id.) Then, beginning in 1989 and continuing during the last four years preceding trial, the Omnicone experienced a fairly large drop in sales. (Id.) According to Nordberg, this drop reflected the entry of imitators to the market seeking to gain a share of the Omnicone's success. (Id.)

86. There is absolutely no evidence of the degree to which the introduction of the Omnicone affected Nordberg's market share vis-a-vis its competitors and no evidence of Nordberg's current market share or its breakdown with respect to the types of crushers sold. (Id.) There is also very little evidence comparing the sales of the Omnicone with the sales of Nordberg's other crushers, the only evidence being Scott Sza-

lanski's general testimony that Nordberg sold a majority of SYMONS crushers during the first four years that the Omnicone was available and a vast majority of Omnicones during the next four years. (Id.)

87. More importantly, there is virtually no evidence tying the success of the Omnicone in the latter four years to the claims-in-suit. While Szalanski generally stated his opinion that the Omnicone was successful because its hydraulic clearing system lowered the customer's operating costs, there was no specific evidence confirming this opinion. (Id.) Indeed, there is some evidence that the relative size and capacity of the Omnicone played a larger role in its success. That is, the smaller 1144 and 1352 models, while they experienced an increase in demand during the years 1985–1988, never saw their popularity explode the way the larger 1560 model did. (Id.) Szalanski attributed this to the fact that the 1560 was large enough to be a high capacity crusher, yet small enough to be portable, and internal Nordberg memoranda confirm that the "size[ ]" of the 1560 had "very little competition". (Id.; see also, Ex. 310.)

## X. DEFINITENESS

88. Claim 8 of the 373 Patent uses the terms "upper frame assembly", "lower frame assembly", "said upper frame" and "said lower frame". (TFOF at ¶ 132.) Neither the specification nor the claims expressly define these terms. (TFOF at ¶ 133.) Claim 8 of the 373 patent also includes the limitation of "release means including biasing and lifting means ... for releasably biasing said upper frame into an abutting relationship with said lower frame and responsive to a first *signal* for deactivating said biasing means and activating said lifting means ... and responsive to a second *signal* for activating said biasing means and deactivating said lifting means." (TFOF at ¶ 136.) Neither the specification nor the claims define the term "signal". (TFOF at ¶ 137.)

---

21. By way of contrast, Nordberg's "HP" model, a subsequently patented crusher employing an entirely new theory of crushing, was introduced in 1990 and sold over thirty (30) crushers in its first year. (TT, Vol. 4 at 650–53, 677.)

## CONCLUSIONS OF LAW

### I. VALIDITY AND INFRINGEMENT

■ 1. This case presents several issues contesting both the validity of the 373 Patent and the infringement of the patent by Telsmith's accused crushers. Generally, when presented with both issues of validity and infringement, lower courts are instructed to decide both issues:

> There has been a tendency among the lower federal courts in infringement suits to dispose of them where possible on the ground of non-infringement without going into the question of validity of the patent.... It has come to be recognized, however, that of the two questions, validity has the greater public importance, ... and the District Court ... followed what will usually be the better practice by inquiring fully into the validity of this patent.

*Sinclair & Carroll Co. v. Interchemical Corporation,* 325 U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644 (1945) (citations omitted).

> When presented with patent validity and infringement issues, trial courts should, as Judge Boyle did here, decide both. First, the parties, witnesses and exhibits involved in both issues are before the court. If a judgment limited to one issue is reversed, it may become necessary to again call many of the same persons before the court for trial or argument on the other. In any event, a remand would normally be necessary for a return by the trial court to whatever fact finding process may be involved in a determination of the undecided issue. Second, a finding that a claimed invention has or has not been appropriated by the alleged infringer may carry substantial weight in a court's analysis of all the evidence bearing on the obvious-nonobvious issue.

*Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1540–41 (Fed.Cir.1983). The matter is clearly one of discretion for the trial court to be exercised on a case-by-case basis. In this case, given the length of time that the matter has already been pending, the length of the trial held herein, and the volume of evidence already placed before the Court, the Court believes the parties are best served by a ruling on both issues to prevent further delay and possible duplication of effort.

### II. VALIDITY

#### A. Presumption of Validity and Burden of Proof

2. Nordberg is the owner of the entire right, title, and interest in and to the 373 Patent, and it is the owner of all rights to seek injunctive relief and to recover damages for the infringement of the 373 Patent. (FOF at ¶ 4.)

■ 3. By statute, every patent is presumed valid. (NCOL at ¶ 5; TCOL at ¶ 2.) The presumption, however, is merely a procedural device which places the burden of coming forward with prima facie evidence of invalidity upon the party challenging the validity of the patent and further requires the challenging party to bear the ultimate burden of persuasion on the issue. (NCOL at ¶¶ 5, 7, 9; TCOL at ¶ 2.)

■ 4. The burden of persuasion is heavy: Telsmith must prove invalidity, and all the facts underlying its theory of invalidity, by clear and convincing evidence. (Id.) "Clear and convincing evidence" has been described as evidence which proves in the mind of the trier of fact an abiding conviction that the truth of the factual contentions are highly probable. (NCOL at ¶ 6.)

■ 5. The presumption of validity and the burdens it creates is unaffected by the fact that Nordberg sought and obtained reexamination of the 373 Patent, although meeting that burden may be more difficult where a reexamination certificate is issued. (NCOL at ¶¶ 12–13; TCOL at ¶ 3.)

■ 6. When the prior art relied upon by the party challenging validity is similar or less pertinent than the prior art considered by the Examiner in issuing the patent, the burden of proof is more difficult to sustain because there is the added burden of overcoming the deference due the Examiner, who is assumed to have expertise in interpreting references and to be familiar with the level of skill in the art. (NCOL at ¶ 15.) Conversely, when the prior art relied upon by the

party challenging validity is different or more pertinent than that considered by the Examiner, the burden of proof is easier to sustain because there is no need to disagree with the Examiner's decision. (NCOL at ¶ 17; TCOL at ¶ 4.)

### B. Claim Construction

■ 7. Each claim of the 373 Patent is treated as if it were a separate patent. (NCOL at ¶ 20.) Each claim of the 373 Patent is presumed valid independent of the validity of the other claims. (NCOL at ¶ 22.) It is clear that an action for patent infringement may be maintained with respect to the valid claims of a patent whenever certain other claims of the patent are invalid. (NCOL at ¶ 22.)

■ 8. Claim language is to be construed in the ordinary usage of the language in accordance with the precepts of English grammar. (NCOL at ¶ 23.)

■ 9. Claims are to be interpreted in view of the specification, the other claims of the patent, the prosecution history of the patent, including the prior art cited therein, and extrinsic evidence, such as expert testimony. (NCOL at ¶ 25.) Claims should be construed, where possible, to sustain their validity. (NCOL at ¶ 26.)

### C. Utility, Novelty and Obviousness

10. The validity of the claims-in-suit depends upon the existence of three statutory elements: (1) utility, 35 U.S.C. § 101; (2) novelty, 35 U.S.C. § 102; and (3) nonobviousness, 35 U.S.C. § 103. (NCOL at ¶ 27.) Telsmith has not challenged the utility of the 373 Patent. Telsmith has only challenged the patent's novelty and nonobviousness.

### 1. Novelty.
#### a. Section 102(a)—Anticipation.

■ 11. A patent is invalid for lack of novelty under 35 U.S.C. § 102 if the patented device is anticipated by a single prior art reference that discloses all of the elements of the claims-in-suit. Substantial similarity to the claimed invention is not sufficient to find anticipation. Every element of the claimed invention must be literally present in a single

prior art reference. When more than one prior art reference is required to establish unpatentability under § 102, anticipation is not present and validity must be determined under the obviousness principles of § 103. (NCOL at ¶¶ 37–40.) Under § 102(a), a device qualifies as "prior art" if it was known, used, patented or described in a printed publication before the applicant's date of invention. (35 U.S.C. § 102(a); TCOL at ¶¶ 9–10.)

■ 12. The standard and application of anticipation is strict. The invention must be disclosed within the four corners of a single reference or description and such disclosure must be shown by clear and convincing evidence. (NCOL at ¶ 43.)

■ 13. Telsmith cites three prior art references as anticipating the 373 Patent under § 102(a): (1) the Saunders patent; (2) the Jeffrey crusher; and (3) the Wedag brochure. (TCOL at ¶¶ 46–55.)

14. The Saunders patent was issued in 1964 and therefore qualifies as prior art under § 102(a). (FOF at ¶¶ 26–28.) Saunders did not anticipate the 373 Patent, however, because Telsmith failed to prove by clear and convincing evidence that Saunders reads on *every* element of the claims-in-suit. For example, Saunders does not contain a single signal which simultaneously deactivates its biasing means and activates its lifting means, and vice versa. (Id.) The hydraulic cylinders in Saunders float and are not "connected", as the Court interprets that word, to either of the two frame assemblies. (Id.) Moreover, it is unclear whether the tramp relief function in Saunders is performed by the hydraulic cylinders. (Id.) Indeed, it appears equally probable that it is the coil springs which provide the tramp relief function in Saunders. (Id.) For the same reason, it is unclear whether fluid is displaced from the hydraulic cylinders to the accumulator during tramp relief. (Id.)

15. The Jeffrey crusher was made and used in the early-to-mid 1960's and therefore qualifies as prior art under § 102(a). (FOF at ¶¶ 29–31.) The Jeffrey crusher did not anticipate the 373 Patent, however, because Telsmith failed to prove by clear and convinc-

ing evidence that the Jeffrey crusher reads on *every* element of the claims-in-suit. For example, the Jeffrey crusher did not provide a bevelled seat between the upper and lower frames. (Id.) It did not have an adjustable bowl mounted to the upper frame for vertical movement relative to the frame assemblies and head assembly. (Id.) Moreover, it is unclear whether the Jeffrey crusher had an abutting relationship between the upper and lower frames and whether the accumulator received fluid displaced from the hydraulic cylinders during tramp relief. (Id.)

16. The Wedag brochure was published in 1961 and therefore qualifies as prior art under § 102(a). (FOF at ¶ 32.) Jeffrey was a licensee for the Wedag device, however, and the Jeffrey crusher was adopted from the drawings and blueprints underlying the device represented in the Wedag brochure. (Id.) Therefore, as is the case with the Jeffrey crusher, the Wedag brochure did not anticipate the 373 Patent because Telsmith failed to prove by clear and convincing evidence that the Wedag device had an abutting relationship between the upper and lower frames and displaced fluid from the cylinders to the accumulator during tramp relief. (Id.)

**b. Section 102(b)—On sale/public use.**

**1. General principles.**

17. Under § 102(b) a device qualifies as prior art if it was patented, described in a printed publication, on-sale or in public use more than one year prior to the date of the patent application. (35 U.S.C. § 102(b); TCOL at ¶ 13.) The one-year period preceding the patent application gives rise to the concept of "the critical date", which in this case is October 14, 1979. (NFOF at ¶ 69; FOF at ¶ 56; NCOL at ¶ 28.) A single public use, sale or offer to sell involving the claimed invention, or involving a device reading upon every element of the claimed invention, before the critical date invalidates the patent under § 102(b). Whether or not an invention was on-sale or in public use within the meaning of § 102(b) is a question of law. *Manville Sales Corporation v. Paramount Systems, Inc.,* 917 F.2d 544, 549 (Fed.Cir. 1990).

18. Whether an invention was "on-sale" or in "public use" under § 102(b) must be determined in light of the policies underlying § 102(b). (Id.) These policies include requiring prompt disclosure, discouraging the removal of devices from the public domain once they are there, prohibiting the extension of the inventor's monopoly period for exploiting the invention, and giving the inventor a reasonable amount of time after his initial sales activity (*i.e.,* one year) to determine whether the patent is a worthwhile investment. (Id.) These policies, in effect, define the reach of the 102(b) bars. *Id.,* at 549–50.

19. Where there is no actual sale prior to the critical date, as is the case here, there must be a definite offer to sell in order to raise the on-sale bar. *RCA Corp. v. Data General Corp.,* 887 F.2d 1056, 1062 (Fed.Cir.1989). (NCOL at ¶ 53.) The requirement of a "definite offer" excludes "merely indefinite or nebulous discussion about a possible sale." *Id.* It may be met by "commercial activity which does not rise to the level of a formal 'offer' under contract law principles...." *Id.* In this regard, "the conduct of the parties and other evidence of events occurring after the transaction may be relevant" to show the intent of an actual or proposed transfer of the claimed invention prior to the critical date. *Kock v. Quaker Oats Company,* 681 F.2d 649, 657 (9th Cir. 1982). (NCOL at ¶ 53.)

20. "Public use may be established either by showing a nonsecret, nonexperimental use of the invention prior to the critical date, ... or by establishing that the inventor himself has used the invention primarily for trade and profit prior to the critical date, whether the use is secret or not." *In re Yarn Processing Patent Validity Litigation,* 498 F.2d 271, 277 (5th·Cir.1974) (citations omitted); *see also, Kearns v. Wood Motors, Inc.,* 773 F.Supp. 979, 982 (E.D.Mich.1990). Use of an invention may be "public" where it is exposed or demonstrated to persons other than the inventor, including customers and salesmen, who are under no obligation of secrecy, and where no attempt is made to keep the device from the knowledge of the public. *Kardulas v. Flori-*

*da Machine Products Co.,* 438 F.2d 1118 (5th Cir.1971). Indeed, the use of a single specimen, even in a factory and in the presence only of the employees, may be a "public" use under certain circumstances. *A. Schrader's Sons, Inc. v. Wein Sales Corporation,* 9 F.2d 306, 308 (2nd Cir.1925). (Citations omitted.)

■ 21. As stated earlier, Telsmith has the burden of overcoming the presumption of validity by clear and convincing evidence that the 373 device was on-sale or in public use more than one year prior to the filing of the patent application. *Pennwalt Corp. v. Akzona Inc.,* 740 F.2d 1573, 1578–79 (Fed.Cir. 1984); *see also, Dragani v. Eastman Kodak Company,* 576 F.Supp. 755, 761–62 (S.D.Ohio 1983). Although this burden remains on Telsmith throughout the proceedings, once a prima facie case is established that the 373 device was sold, offered for sale, or used in public prior to the critical date, Nordberg must come forward with countervailing evidence that the sale or use at issue was primarily for experimental and not commercial purposes. *Id.* To meet this burden, Nordberg's evidence of experimental use must be equally clear and convincing. *Dragani,* 576 F.Supp. at 762. A use or sale ceases to be experimental when the motivation is to exploit the invention and gain a competitive advantage over others. *In re Yarn,* 498 F.2d at 278.

■ 22. In determining whether a use or sale was experimental, certain "objective evidence" is preferred over the inventor's "subjective intent", which is generally of minimal value. *In re Smith,* 714 F.2d 1127, 1135 (Fed.Cir.1983). Such "objective evidence" includes, inter alia: (1) the necessity for public testing; (2) the amount of control retained over the operation; (3) the extent of public testing in relation to the nature of the invention; (4) the length of the test period; (5) whether any payment was made; (6) whether there was a secrecy obligation; (7) whether progress records were kept; (8) who conducted the experiments; (9) the degree of commercial exploitation during the tests in relation to the purpose of the experimentation; and (10) whether the inventor inspected the machine during the alleged experiment.

*Id.; Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1564 (Fed.Cir.1987).

■ 23. In determining whether there was a prior public use or sale, or whether the prior use or sale was experimental, "unsupported oral testimony can be sufficient but must be regarded with suspicion and subjected to close scrutiny." *E.I. du Pont de Nemours & Co. v. Berkley and Co.,* 620 F.2d 1247, 1261 (8th Cir.1980). This suspicion stems from the "unsatisfactory" nature of such testimony:

> We have now to deal with certain unpatented devices, claimed to be complete anticipations of this patent, the existence and use of which are proven only by oral testimony. In view of the unsatisfactory character of such testimony, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury, courts have not only imposed upon defendants the burden of proving such devices, but have required that the proof shall be clear, satisfactory and beyond a reasonable doubt. Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information.

*Medtronic, Inc. v. Daig Corp.,* 611 F.Supp. 1498, 1511, n. 14 (D.Minn.1985). Courts therefore consider such testimony in light of several relevant factors: (1) the delay between the event and trial; (2) the interest of the witnesses; (3) contradiction or impeachment; (4) corroboration; (5) the witnesses' familiarity with details of the alleged prior structure; (6) the improbability of prior use considering state of the art; (7) the impact of the invention on the industry; and (8) the relationship between the witnesses and the alleged prior user. *Id.*

■ 24. It is well-established that "the concepts of public use and sale, as those concepts are defined in § 102(b) so as to result in patent invalidity, are inextricably bound to the exception of experimental use, as that exception has evolved in the case law." *Eastman Kodak,* 576 F.Supp. at 761–

62. An "experimental use" is defined as a use or sale of the invention aimed at "perfecting or completing an invention to the point of determining that it will work for its intended purpose." *RCA*, 887 F.2d at 1061. Such a use or sale prior to the critical date will not trigger a public use or on-sale bar. However, "[i]t is settled law that the experimental use exception is not applicable to experiments performed with respect to unclaimed features of an invention." *In re Smith*, 714 F.2d at 1136. "[T]he rule is that an invention is deemed functional for public use purposes when it can perform the general function for which it has been developed, even though the device might later be refined." *Id.*, quoting, *Minnesota Mining and Mfg. Co. v. Kent Industries, Inc.*, 409 F.2d 99, 101 (6th Cir.1969).

■■■■ 25. An important issue that has arisen in this case regarding the experimental use exception is the effect that an actual reduction-to-practice has upon any allegation of subsequent experimental use. "Reduction to practice" is a term of art in patent law and is defined as that point in time at which an invention is "sufficiently tested to demonstrate that it will work for its intended purpose." [22] *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 838 (Fed.Cir.1984); *see also, In re Yarn*, 498 F.2d at 280. The degree and nature of testing required for a reduction to practice necessarily depends upon the nature and purpose of the invention at issue. *Scott v. Finney*, 34 F.3d 1058, 1061–63, 32 U.S.P.Q.2d 1115, 1118–19 (Fed.Cir.1994). For example,

mere construction of a prototype may be enough to qualify as a reduction to practice in those rare instances where a device is so simple in nature that satisfactory operation is obvious even without testing. *Scott*, 34 F.3d at 1061–62, 32 U.S.P.Q.2d at 1118; *In re Yarn*, 498 F.2d at 279–80 and n. 5. At the same time, where durability under various conditions is the underlying purpose of the invention, extended testing under such conditions, sometimes even in public, may be necessary to prove that the invention will work for its intended purpose, *i.e.*, to reduce it to practice. *See e.g., Elizabeth v. Pavement Co.*, 97 U.S. 126, 136, 24 L.Ed. 1000 (1878); *Manville Sales*, 917 F.2d at 550–51. "Actual performance is required of the function for which the machine is intended with a quality, extent, and character of operation sufficient to indicate its utility in the environment in which it is contemplated to be useful." *In re Yarn*, 498 F.2d at 280 (citations omitted). However, "there is no requirement for a reduction to practice that the invention, when tested, be in a commercially satisfactory stage of development." *Barmag*, 731 F.2d at 838 (citations omitted); *see also, Scott*, 34 F.3d at 1061–62, 32 U.S.P.Q.2d at 1118. The invention need not be "mechanically perfect" or a "commercial success". *In re Yarn*, 498 F.2d at 280 (citations omitted). "Testing need not show utility beyond a possibility of failure, but only utility beyond a probability of failure." *Scott*, 34 F.3d at 1062, 32 U.S.P.Q.2d at 1118.

26. In *RCA*, 887 F.2d at 1061, the Federal Circuit held that an "experimental use,

---

**22.** Nordberg's legal expert, Charles Gholz, suggested that there are two definitions of reduction to practice, one applicable to interferences—where priority challenges are made—and one applicable to the on-sale and public use bars. (TT, Vol. 5 at 826–27, 924–32.) He refers to the former as "investive" reduction to practice, presumably because it is critical to the issuance of a patent, and the latter as a "divestive" reduction to practice, presumably because it is critical to the invalidation of a patent. (Id.) Gholz suggested, *inter alia,* that Nordberg's test center tests qualify as an "investive" reduction to practice, thereby giving Nordberg's Model B priority over Telsmith's 1100F, but do not qualify as a "divestive" reduction to practice, thereby leaving open the possibility that the subsequent field tests of the Model B at the Tanner site were still an "experimental use". Gholz was unable to cite,

however, a single opinion expressly recognizing this convenient distinction. More importantly, the Federal Circuit has expressly stated that no such distinction exists:

> Various phrases concerning an advanced stage of development of a device in order to fall under the "on sale" bar have appeared in the opinions of some circuits. This has led commentators to opine that a dichotomy exists between interference cases and "on sale" cases with respect to the meaning of "reduction to practice." We discern no distinction in our precedents.

*Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 838, n. 6 (Fed.Cir. 1984). Based on the foregoing, the Court rejects Gholz's suggested dichotomy in the definition of the phrase "reduction to practice."

which means perfecting or completing an invention to the point of determining that it will work for its intended purpose, ends with an actual reduction to practice." This principle was recently reiterated by the Federal Circuit in *Atlantic Thermoplastics Co. v. Faytex Corp.*, 5 F.3d 1477, 1480 (Fed.Cir. 1993) ("... experimental use does not defeat the on-sale bar once the invention has been reduced to practice.").[23] This principle simply reflects the fact that "the legal definition of the date of reduction to practice appears to equate it precisely with the end of the experimental period for purposes of § 102(b)." *In re Yarn*, 498 F.2d at 280.

■ 27. Nordberg argues that *Manville Sales, supra,* a decision issued by the Federal Circuit only one year after the *RCA* decision, suggests that an experimental use can still occur after a reduction to practice. (Nordberg Post–Trial Reply Brief at 3.) *Manville Sales* involved the invention of a self-centering luminaire assembly for tall outdoor light poles. Manville had a contract to install such an assembly on a light pole in a public rest area in Wyoming. The initial assembly installed by Manville failed. Later that same month, Manville designed a new assembly better equipped to travel up and down the pole in all elements, thereby providing reliable accessibility and easy maintenance. The device used "iris" guide arms instead of the prior art vertical guide arms. The latter had a tendency to get stuck on a pole and were the arms used on the prior Manville assembly that failed. Prior to the critical date, a working model was constructed, installed and tested on a test pole at Manville's R & D center in Ohio. Also prior to the critical date, the device was installed on the light pole at the rest area in Wyoming, prior to its being opened to the public. The device was tested and failed due to severe weather conditions, although the "iris guide arms" were found to have worked properly.

28. An issue arose regarding whether the installation of the luminaire assembly on the outdoor light pole prior to the critical date constituted a public use or sale invalidating the patent under § 102(b). The Federal Circuit found the use to be experimental and the patent valid. In doing so, the Federal Circuit did not discuss the issue of whether device had been reduced to practice prior to the outdoor installation and what affect such a finding would have on its decision. However Charles Gholz, Nordberg's legal expert at trial, opined that an actual reduction to practice had occurred as a result of the tests at Manville's R & D center and thus one could infer that *Manville Sales* stands for the proposition that an experimental use can extend beyond an actual reduction to practice.

---

**23.** *RCA* and *Atlantic* appear to conflict with prior statements on the issue by the Federal Circuit. Indeed, only two years before the *RCA* decision, another panel of the Federal Circuit stated that an actual reduction-to-practice was only one factor among many to consider in a § 102(b) analysis:

We do not reject "reduction to practice" as an important analytical tool in an on-sale analysis. A holding that there has or has not been a reduction to practice of the claimed invention before the critical date may well determine whether the claimed invention was in fact the subject of the sale or offer to sell or whether a sale was primarily for an experimental purpose. A holding that there is a reduction to practice of the claimed invention "may, of course, lighten the burden of the party asserting the bar." ... *Thus, we simply say here that the on-sale bar does not necessarily turn on whether there was or was not a reduction to practice of the claimed invention.* All of the circumstances surrounding the sale or offer to sell, including the stage of development of the invention and the nature of the invention, must be considered and weighed against the policies underlying section 102(b). *UMC Electronics Company v. United States*, 816 F.2d 647, 656 (Fed.Cir.1987). (Citations omitted, emphasis supplied.) Other courts and judges have reached similar conclusions. *See e.g., Gould Inc. v. United States*, 579 F.2d 571, 584–86, 217 Ct.Cl. 167 (1978) (Nichols, J., dissenting); *In re Smith*, 714 F.2d at 1134 ("There may be an experimental use following reduction to practice as long as the experiments are, as they were here, part of an attempt to further refine the device."); *Dragani*, 576 F.Supp. at 764–65 ("unique circumstances may arise where experimentation continues beyond a point where an invention has been reduced to practice").

The Court is not sure how to reconcile these conflicting statements. The Court will defer, however, to the Federal Circuit's most recent pronouncements on the issue in the *RCA* and *Atlantic* cases, not only because they are binding upon the Court, but also because they strike the Court as the most logical and correct resolution of the issue.

The Court does not agree with this interpretation of *Manville Sales*. In reaching its decision, the Federal Circuit expressly found that "[t]he iris arm device was *specifically designed* to withstand year around weather. Prior to its testing in the winter environment, there really was no basis for confidence by the inventor *that the invention would perform as intended,* and hence no proven invention to disclose." *Id.,* at 550 (emphasis supplied). This is the equivalent of a finding that the invention had not been reduced to practice. It had not been reduced to practice because, as the Circuit Court explained, durability in all weather conditions was the inventive advance: "When durability in an outdoor environment is inherent to the purpose of an invention, then further testing to determine the invention's ability to serve that purpose will not subject the invention to a section 102(b) bar." *Id.,* at 551. *Manville Sales* simply confirms that the point at which a device becomes "reduced to practice" depends heavily on the nature and purpose of the invention, insofar as the same dictates what kind of testing is required before the inventor can be satisfied that the device will work for its intended purpose.

29. Nordberg also argues that *RCA* was an "on-sale" case and thus its holding should only be applied to the "on-sale" issues in this case, not the "public use" issues. Support for this position can be drawn from *Kearns, supra.* In *Kearns,* a Michigan district court declined to apply *RCA*'s holding in a public use case because, while the public use and on-sale bars are "undeniably related", "they are not interchangeable". *Kearns,* 773 F.Supp. at 982. The *Kearns* court did not explain the relevant differences between the two statutory bars that would justify their different treatment in connection with the reduction to practice issue. Certainly nothing in the *RCA* decision suggests that its holding was only meant to apply to on-sale cases. As stated earlier, the logic behind the decision was the symmetry between the definitions of "experimental use" and "reduction to practice", a symmetry which exists regardless of whether the Court is faced with an on-sale or public use challenge. The Court can therefore discern no persuasive basis for limiting *RCA* to on-sale issues.

### 2. The Model B.

30. Telsmith's assertion of the public use and on-sale bars is twofold. First, Telsmith asserts a fairly common form of these defenses by arguing that Nordberg's Model B, the initial prototype of the 373 Patent, was on-sale and in public use at Tanner prior to the critical date of October 14, 1979.

31. The invention of the 373 Patent was reduced to practice on or before June 1, 1979. By that date, the Model B was constructed and test center tests proved that it would crush rock and perform hydraulic tramp relief and clearing. (FOF at ¶ 40.) While the crushing runs were of short duration and used relatively soft limestone, and while the tramp relief and clearing functions were tested under no-load conditions, it was Gieschen's testimony at trial that such tests were sufficient to demonstrate that the 373 Patent was workable for its intended purpose. (Id.) This testimony is also consistent with Nordberg's own response to a Telsmith interrogatory submitted during discovery, wherein Nordberg declared June 1, 1979 as the date the 373 Patent was reduced to practice. (TT, Vol. 2 at 180–88.) Of course, the commercial viability and long-term reliability of the 373 device was not proven until the field tests were conducted later that year at the Tanner facility, but it is not necessary that an invention be in a commercially satisfactory stage of development in order to be reduced to practice. (COL at ¶ 25.) In order to succeed in the marketplace, long-term reliability and durability under operating conditions is no doubt a necessary and desirable feature of any piece of heavy equipment. Testing for such reliability and durability, however, does not automatically extend the period of experimental use for purposes of reducing an invention to practice. As stated earlier, where increased durability or reliability is part of the inventive advance itself, such that it fairly represents at least one of the improvements over the prior art for which the inventor is seeking a patent, then testing for such durability is necessary before the invention is reduced to practice. Here, there is no claim or showing that durability under operating conditions was one of

the technological advances achieved by the claims-in-suit, or that the Model B was specifically designed to be more durable in a dusty, outdoor environment than the prior art. There is no claim or showing that Gieschen, prior to the field tests, was unsure as to whether the Model B would crush rock or perform tramp relief and clearing under normal operating conditions. Gieschen himself, a person of ordinary skill in the art, stated that he knew the Model B would work after the shop tests and test center tests. (FOF at ¶ 40.) The only showing is that field tests were necessary in order to further refine the Model B and to verify that it was reliable in the sense that all machines must be reliable, *i.e.*, that it would stand up to the rigors of its intended environment. Such experiments related primarily to the marketability of the device *as a whole* and were not necessary, or even intended, to determine the general utility of the specific claims-in-suit.

■ 32. It is undisputed that there was no actual sale of the Model B prior to the critical date. Telsmith alleges, however, that the Model B was "offered for sale" to the Tanner Company prior to the critical date. The only evidence of such an "offer", however, was Gary Nielson's testimony that he understood from the beginning that Tanner would be able to purchase the Model B at the end of the field test if it so desired. (FOF at ¶ 44.) There is no documentary evidence or other corroboration of Nielson's testimony. There is no evidence that any terms of sale were ever discussed prior to the critical date. The initial testing agreement made no mention of the crusher being offered for sale to Tanner or of any try-buy arrangement between Nordberg and Tanner. (Id.) To the contrary, the agreement expressly provided that the crusher would be removed from the plant at the conclusion of the field tests. (Id.) The first documentary proof of an option to purchase the Model B was the April 25, 1980 amendment to the initial testing agreement, which is well after the critical date of October 14, 1979. (FOF at ¶ 45.) Given the 13–year delay between the field tests and Nielson's testimony, and the fact that his oral testimony is unsupported and uncorroborated by any other evidence, the Court gives it little weight. (COL at ¶ 23.)

Viewed in the context of the documentary evidence showing no discussion of a possible purchase until well after the critical date, and the fact that Nordberg retained general control over the device until well after the critical date, Telsmith clearly failed to prove by clear and convincing evidence that the Model B was offered for sale prior to October 14, 1979. Even giving full credit to Nielson's testimony, there were at best only "indefinite or nebulous discussion[s] about a possible sale", which are insufficient to trigger the on-sale bar. (COL at ¶ 19.)

■ 33. It is clear, however, that the Model B was in use at Tanner in September of 1979, before the critical date. (FOF at ¶ 45.) It is also clear that the use was "public". First, it was "public" as to Tanner and the Tanner employees involved in the field tests. While Nordberg retained control over the Model B prior to the critical date, it retained no control over Tanner's access to the machine or potential disclosure of information concerning the machine to others. The initial testing agreement provided that Tanner employees would have "free and unlimited access to the crusher at all times." (FOF at ¶ 42.) That agreement placed no obligation of secrecy or confidentiality upon Tanner or its employees. (Id.) Tanner employees were thus free to examine the machine and its operation and free to pass on such information to others. Nielson testified that no confidentiality agreement existed. (See, footnote 14, *supra.*) While Gieschen thought a separate confidentiality agreement existed between Nordberg and Tanner, no such agreement has ever been produced, and on cross-examination Gieschen admitted he had never seen the alleged agreement and was simply assuming that one existed. (Id.) While it is true that an express confidentiality agreement is not always required and that one may be implied from the surrounding circumstances and the relationships of the parties, one cannot be implied here. (NCOL at ¶¶ 71–72.) Nordberg and Tanner are completely separate and independent business entities. There is no showing that Nordberg had any corporate affiliation or control over Tanner. Moreover, the Model B was used in a relatively wide open location

and under commercial circumstances. (FOF at ¶ 43.) These facts are contrary to those in *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261 (Fed.Cir.1986), relied upon by Nordberg, where confidentiality was found to be implicit in an inventor's confidential demonstration of his invention to close colleagues in a personal and informal setting.

34. Second, the use at Tanner also appears to have been "public" as to Nordberg dealers. While the initial testing agreement contained a provision stating that third-party visits were to be discouraged and made only when mutually agreeable to both Nordberg and Tanner, Nielson testified that various Nordberg dealers were shown the Model B during the first weeks of operation, which is prior to the critical date.[24] (FOF at ¶ 43; TT, Vol. 10 at 1748–55.) While the Court would normally be suspicious of such oral testimony, it is confirmed by Ex. 606, a *Nordberg* memorandum dated November 1, 1979 and expressing a concern that the "free visiting" by various dealer personnel may cause a patentability problem in absolute novelty countries. (Id.; Ex. 606.) There is no showing that the dealers were subject to any confidentiality agreements. And while Gieschen testified that he made efforts to keep third parties away from the machine, especially during the early months of testing, these efforts apparently did not include Nordberg dealers. (Id.)

35. The lack of a confidentiality agreement between Nordberg and Tanner and the free visiting by Nordberg dealers prior to the critical date are even more significant when one considers the physical circumstances under which the Model B was tested. Quarries such as Tanner are, by nature, wide open locations. (FOF at ¶ 43.) There were no special barriers erected around the Model B to hide its operation or ward off third parties. (Id.) There was a fence around the quarry itself, but the gate was open during the daytime. (Id.) During working hours, there was little to no control over who came in and out of the quarry. (Id.) The road from the main gate led past the Model B and anybody who drove down the road could see the Model B in operation. (Id.) Thus, precisely because quarries like Tanner offer little in the way of privacy, it was especially important for Nordberg to obtain a confidentiality agreement from Tanner and to make sure that "free visiting" by third parties, including Nordberg dealers, did not occur. On the record before this Court, it is clear this was not done.

36. Based on the foregoing, the Court finds that Telsmith proved a prima facie case of public use at Tanner prior to the critical date by clear and convincing evidence. Under the principles governing such cases, Nordberg had to come forward with convincing evidence that this public use was experimental. (COL at ¶ 21.) This it has failed to do. As found earlier, the 373 Patent was reduced to practice on or around June 1, 1979, well before the field tests at Tanner. (COL at ¶ 31.) Thus, under the Federal Circuit's decision in *RCA*, the period of experimental use ended on or around June 1, 1979 and the use at Tanner cannot be deemed experimental for purposes of § 102(b). Accordingly, Telsmith has proved by clear and convincing evidence that the claimed invention was in public use at Tanner prior to October 14, 1979, rendering the patent invalid under § 102(b).

### 3. The 1100F.

37. The second form of Telsmith's 102(b) defense is unusual insofar as it posits the public use or sale of a device independently developed by a third party, without the inventor's knowledge, and without either party drawing upon or being aware of the other's concurrent efforts. Telsmith argues that the 1100F, its own prototype developed independent of Gieschen's device, reads literally upon the claims-in-suit and was on-sale and in public use more than one year prior to the critical date by virtue of (1) its use at the Agtec '79 conference; and (2) its being "offered for sale" to the Crystal Lake aggregate plant. It is clearly established that the public use or sale of an invention by a third-

---

24. The field tests began on September 24, 1979, roughly three weeks before the critical date of October 14, 1979. (FOF at ¶ 45.)

party prior to the critical date, even without the knowledge or consent of the inventor, will invalidate the patent. *See generally, Loom Co. v. Higgins,* 105 U.S. 580, 593–94, 26 L.Ed. 1177 (1882); *Andrews v. Hovey,* 124 U.S. 694, 719, 8 S.Ct. 676, 686, 31 L.Ed. 557 (1888); *Pennwalt,* 570 F.Supp. 1097, 1105 (D.Del.1983), *aff'd* 740 F.2d 1573, 1580 at n. 14 (Fed.Cir.1984); *Hobbs v. United States Atomic Energy Com.,* 451 F.2d 849, 859–60 (5th Cir.1971); *O'Brien v. Westinghouse Electric Corp.,* 293 F.2d 1, 10 (3rd Cir.1961); *Lorenz v. Colgate–Palmolive–Peet Co.,* 167 F.2d 423, 429 (3rd Cir.1948); *Noma Lites Canada Ltd. v. Westinghouse Electric Corp.,* 399 F.Supp. 243, 253 (D.D.C.1975). This appears to be so even though the third party did not use or sell the inventor's prototype or have prior access to the inventor's ideas.[25] *See generally, Bird Provision Co. v. Owens Country Sausage, Inc.,* 379 F.Supp. 744, 746–51 (N.D.Tex.1974), *aff'd* 568 F.2d 369 (5th Cir.1978).

▪ 38. The 1100F clearly reads on the claims-in-suit. (FOF at ¶ 49.) The 1100F was reduced to practice after the conclusion of the shop tests in early July, 1979. (FOF at ¶ 49.) Like the test center tests for the Model B, the shop tests of the 1100F included testing the hydraulic tramp relief and clearing functions under no load conditions. (Id.) Both functions operated satisfactorily. (Id.) Unlike the Model B, however, the shop tests of the 1100F did not include the actual crushing of rock. (Id.) This fact is not determinative, however, because the hydraulic tramp relief and clearing are the features of the claims-in-suit and no one has argued that the manner in which the Model B or the 1100F crushed rock was a new or patentable

development. The failure to test features of a device unrelated to the claims-in-suit do not preclude a reduction to practice of the claimed invention. (COL at ¶ 24.) Nor was there any need to run rock through the 1100F before Telsmith could be sure that it would crush rock. Like Nordberg, Telsmith has been making rock crushers for years. As Stafford testified, the 1100F invention simply took the design of Telsmith's well known 1100E spring crusher, which had been in the field for years and had amply demonstrated its utility, and substituted hydraulics for springs in order to perform tramp relief and clearing. (FOF at ¶ 47.) Stafford and Telsmith knew the 1100E could crush rock and there was no reason to doubt that the 1100F would crush rock as well. (TT, Vol. 11 at 1928–31.) An inventor does not have to test those features of a new machine that are well known in the art and which the inventor has seen work on prior machines in order to determine that they will work on the new machine. *See e.g., Scott,* 34 F.3d at 1062–64, 32 U.S.P.Q.2d at 1119–20. Thus, the Court finds that the 1100F was demonstrated to work for its intended purpose after the shop tests in early July of 1979 and was reduced to practice at that time.

▪ 39. Telsmith argues that the 1100F was on-sale prior to the critical date by virtue of the May 24, 1979 letter agreement between Telsmith and Crystal Lake setting forth the conditions of their field test and try-buy arrangement concerning the 1100F. (Ex. 553.) It is clear, however, that there was no "definite offer to sell" communicated in this letter agreement or at anytime prior to the critical date. The letter simply raises

---

25. Given the policies underlying the § 102(b) bar, one could argue that reliance upon a third-party device in this manner is inappropriate. That is, the policies of prompt disclosure, prohibiting the extension of the inventor's monopoly, and giving the inventor a reasonable amount of time to determine the worthiness of his invention are hardly furthered by invalidating the inventor's patent because of an unknown public use or sale of a device independently conceived and reduced to practice by a third party. Indeed, how is an inventor to determine when he must disclose his invention if the one year disclosure period can be triggered by a third-party's invention that he has no knowledge of or control over?

One could argue that in situations like this, where there is relatively concurrent development of the same invention by two original inventors, the issue of validity is best resolved by the inevitable priority dispute, and once priority is established, a public use or sale of the junior device prior to the critical date cannot invalidate a patent on the senior device. On the other hand, the fourth policy underlying § 102(b) is discouraging the removal of devices from the public domain once they are there. If the 1100F was in the public domain prior to the critical date, invalidating the 373 Patent certainly furthers this important policy. As indicated above, the precedent supports the latter position.

the possibility of a sale in the future if the crusher performed adequately:

> ... since you have expressed the need and desire for a rotator on your existing machine it is entirely possible that once you have become accustomed to the rotating device as well as the new features on the experimental Crusher that you may ·be interested in keeping the new Crusher and trading off the old. If this should become the case we are sure that this type of arrangement could be worked out to the satisfaction of both parties. However, we will leave this for future consideration on your part.

(Ex. 553.) No terms of a possible sale were ever discussed prior to the critical date. (FOF at ¶¶ 53–54.) After the crusher performed satisfactorily, an offer to sell at a specific price was submitted by Telsmith, but this took place well after the critical date. (Id.) Telsmith argues that it has a company policy that every crusher it builds, including prototypes, are "for sale" as soon as they are built. (TT, Vol. 8 at 1381.) That may be true and may indicate Telsmith's subjective intent, but the subjective intent of the inventor is not sufficient to place a device "on-sale" for purposes of § 102(b). (COL at ¶ 22.) The bottom line is that the objective evidence indicates at best only an "indefinite or nebulous discussion about a possible sale" in the future, which is insufficient to trigger the on-sale bar. (COL at ¶ 19.)

■ 40. Telsmith also argues that the 1100F was on-sale during the Agtec '79 conference in September of 1979, prior to the critical date. The only evidence of the same is the oral testimony of the attendees, most of whom stated that they understood the 1100F to be on sale and that they should begin to solicit orders. (FOF at ¶ 52.) However, as stated earlier, oral testimony of this kind must be regarded with suspicion and given close scrutiny. (COL at ¶ 23.) Here, the testimony at issue claimed to recollect events occurring 13–14 years prior to the trial. The testimony comes from Telsmith's top dealers at the time who, while being independent entities, are nonetheless somewhat aligned with Telsmith's interests. (FOF at ¶ 50.) And while their collective

testimony tends to be consistent and mutually supportive, it is absolutely uncorroborated ·by any documentary or other evidence. For example, none of the attendees testified that they approached a customer or solicited orders after the conference and prior to the critical date, nor was documentary evidence of such solicitation provided. (FOF at ¶ 52.) Nor did Telsmith produce any brochures or other materials from this time promoting the new crusher or soliciting orders for the same. (Id.) Finally, there is evidence contradicting the oral testimony of the dealers called at trial. First, one dealer who attended the conference and who was not called at trial stated in a deposition that the 1100F was not ready for sale and that the only reason it was discussed and demonstrated was to introduce it as a machine that would be available some time in the future. (Id.) More importantly, there is no discussion in the materials distributed at the conference regarding the 1100F of the machine being on sale or even suggesting that the attendees solicit orders for the machine. (Id.) If the 1100F was truly on sale at this time, one would expect these materials to discuss or encourage the solicitation of orders, as was done subsequently in Telsmith's April 23, 1980 notice to dealers encouraging the solicitation of prospective buyers for the machine. (Id.)

41. Based on the COL ¶¶ 39 & 40, Telsmith failed to prove by clear and convincing evidence a prima facie case that the 1100F was on sale prior to the critical date.

■ 42. Telsmith also argues, however, that the 1100F was in public use prior to the critical date by virtue of it being demonstrated to many of these same Telsmith dealers at the conclusion of the Agtec '79 conference. It is basically undisputed that many of the attendees of Agtec '79, including many of the dealer representatives, visited Telsmith's plant in Milwaukee after the conference and witnessed demonstrations of the 1100F. (FOF at ¶ 51.) There is no evidence that these individuals were under any express or implied obligation of secrecy regarding what they witnessed. (Id.) It is also undisputed that, while no rock was run through the crusher, the tramp relief and clearing mechanisms were demonstrated to the participants.

(Id.) As stated earlier, the use of an invention may be "public" where it is exposed or demonstrated to persons other than the inventor, including customers and salesmen, who are under no obligation of secrecy and where no attempt is made to keep the device from the knowledge of the public. (COL at ¶ 20.) Indeed, the use of a single specimen, even in a factory and in the presence only of the employees, may be a "public" use under certain circumstances. (Id.) Here, the 1100F was demonstrated to Telsmith dealers who are Telsmith's direct customers and who are certainly more analogous to the relevant "public" than are Telsmith employees. It was demonstrated without any obligation of secrecy and without any effort to prevent knowledge of the machine from becoming public. While this use of the 1100F was certainly less public than the use of the Model B at Tanner (because it did not take place in an open, commercial setting and did not involve the operation of the machine in its intended manner), Telsmith has nonetheless proven by clear and convincing evidence a prima facie case that the 1100F was in public use prior to the critical date.

43. As was the case with the public use of the Model B at Tanner, the demonstration of the 1100F after the Agtec conference cannot be deemed an experimental use under § 102(b) because the machine was reduced to practice in early July, 1979, long before the use at issue. (COL at ¶ 38.) Therefore, Nordberg failed to come forward with convincing evidence of experimental use and the Court finds that Telsmith has proved by clear and convincing evidence that the 1100F was in public use prior to the critical date. The 373 Patent is therefore invalid under § 102(b).

### c. Section 102(g)—Priority.

44. A patent will be invalid under 35 U.S.C. § 102(g) if clear and convincing evidence shows prior invention by another:

A person shall be entitled to a patent unless—

\* \* \* \* \* \*

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

(NCOL at ¶ 83.)

45. Telsmith alleges that the 373 Patent is invalid because Telsmith's conception and reduction to practice of the 1100F has legal priority over Nordberg's conception and reduction to practice of the Model B. (NCOL at ¶ 82.)

46. Determinations of priority are made in two situations—in interference proceedings pursuant to 35 U.S.C. § 135 or 35 U.S.C. § 291, and in infringement actions, where "prior invention by another" is available as a defense. (NCOL at ¶ 85.)

47. It is well established that, in a priority contest, the party first to conceive and first to reduce to practice prevails. (NCOL at ¶ 86.)

48. The Model B was conceived by Gieschen on or before April 25, 1977. (FOF at ¶ 39.) The 1100F was conceived by Stafford no earlier than June 27, 1978 and no later than December 18, 1978. (FOF at ¶¶ 48 & 49.) In either case, Gieschen was the first to conceive. The Model B was reduced to practice on or around June 1, 1979. (FOF at ¶ 40; COL at ¶ 31.) The 1100F was reduced to practice no sooner than early July, 1979. (FOF at ¶ 49; COL at ¶ 38.) Thus, Gieschen was the first to conceive and the first to reduce to practice. The 373 Patent is therefore not invalid under § 102(g).

### d. Nonobviousness.

49. The test of obviousness under 35 U.S.C. § 103 is whether the claimed invention as a whole would have been obvious at the time it was made to one of ordinary skill in the relevant art and in light of the teachings of the prior art. Included within the presumption of validity is a presumption of nonobviousness which Telsmith must overcome by clear and convincing evidence. (NCOL at ¶ 104.) The question of obviousness is a question of law based on underlying

factual evidence. (NCOL at ¶ 107; TCOL at ¶ 63.)

■ 50. Under the seminal decision of the United States Supreme Court in *Graham v. John Deere Co.,* 383 U.S. 1, 35, 86 S.Ct. 684, 702–03, 15 L.Ed.2d 545 (1966), the standard of inquiry on a claim of obviousness requires a consideration of three factors: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the pertinent art. (NCOL at ¶ 105.)

■ 51. In addition to these three factors, secondary considerations such as commercial success, long-felt need in the industry, and copying by others must be considered in determining the issue of obviousness. (NCOL at ¶ 106.)

■ 52. For purposes of § 103, the hypothetical person of ordinary skill in the art is presumed to know all of the teachings existing in the art at the time the alleged invention was made, including those which may not have been cited to the Examiner during prosecution. (TCOL at ¶ 67; *see also, Trilogy Communications, Inc. v. Comm. Scope Co.,* 754 F.Supp. 468, 507 (W.D.N.C.1990). This hypothetical person is pictured as working in his shop with the prior art hanging on the walls around him. *Trilogy,* 754 F.Supp. at 507. The relevant prior art should be addressed collectively to determine its teachings as a whole. *Id.* There is no requirement that the devices or methods disclosed in references be capable of being physically combined or substituted before the references may be addressed collectively. *Id.,* at 507–08.

53. "The obviousness standard, while easy to expound, is sometimes difficult to apply." *Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837 F.2d 1044, 1050 (Fed.Cir.1988). "It requires the decisionmaker to return to the time the invention was made." *Id.* "The invention must be viewed not with the blueprint drawn by the inventor, but in the state of the art that existed at the time...." *Id.,* at 1050–51. "That which may be made clear and thus 'obvious' to a court, with the invention fully diagrammed and aided ... by experts in the field, may have been a break-

through of substantial dimension when first unveiled." *Id.,* at 1051.

■ 54. The invention claimed in the 373 Patent, as it pertains to the claims-in-suit, was a conical crusher equipped with a single mechanical (hydraulic) apparatus for both hydraulic tramp release and clearing and which utilized such apparatus for retaining or biasing the upper frame against the lower frame in an abutting relationship. (NFOF at ¶ 20.) The use of hydraulic cylinders or other mechanical means for performing tramp release and clearing and for creating the abutting relationship was known in the relevant art well before the invention of the 373 Patent. (Ex. 621; NFOF at ¶¶ 157, 161, 213; FOF at ¶¶ 14–33.) What was missing, according to Nordberg, was a crusher that performed all three functions and which did so by means of a single hydraulic system or mechanical apparatus. (Ex. 621; NCOL at ¶ 20; Nordberg Post–Trial Brief at 38; Nordberg Post–Trial Reply Brief at 8–10.) In this respect the 373 Patent is properly described as a "combination" patent, *i.e.,* one that combines old elements existing in the prior art to make a new patentable device. (Ex. 621.)

■ 55. Historically, where the claimed nonobviousness of an invention rested upon a new combination of old elements existing in the prior art, the claimed invention had to pass a severe test of nonobviousness consonant with the difficulty and improbability of finding invention in the assembly of old elements. *Pate Co. v. RPS Corp.,* 685 F.2d 1019 (7th Cir.1982); *Airtex Corp. v. Shelley Radiant Ceiling Co.,* 536 F.2d 145 (7th Cir. 1976). This led some courts to require that the invention be "synergistic", *i.e.,* that the combination of old elements result in some unusual or surprising effect that was not expected. *See e.g., Smith International, Inc. v. Hughes Tool Co.,* 664 F.2d 1373 (9th Cir. 1982); *True Temper Corp. v. CF & I Steel Corp.,* 601 F.2d 495 (10th Cir.1979). The Federal Circuit appears to have overruled this line of cases, however, finding there is no requirement of a synergistic effect and that there is no basis for treating combinations of old elements differently in determining patentability. *See generally, Fromson v. Ad-*

vance Offset Plate, Inc., 720 F.2d 1565, 1570 (Fed.Cir.1983); Kansas Jack, Inc. v. Kuhn, 719 F.2d 1144 (Fed.Cir.1983).

56. "A holding that combination claims are invalid based merely upon finding similar elements in separate prior art patents would be contrary to statute and would defeat the congressional purpose in enacting Title 35." Smithkline Diagnostics, Inc. v. Helena Laboratories Corp., 859 F.2d 878, 887 (Fed.Cir. 1988). "Care must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit." Grain Processing Corp. v. American Maize–Products Co., 840 F.2d 902, 907 (Fed.Cir.1988). Courts "cannot pick and choose among the individual elements of assorted prior art references to recreate the claimed invention." Smithkline, 859 F.2d at 887. Consequently, "[w]hen prior art references require selective combination by the court to render obvious a subsequent invention, there must be some reason for the combination other than the hindsight gleaned from the invention itself." Uniroyal, 837 F.2d at 1051. "Something in the prior art as a whole must suggest the desirability, and thus the obviousness, of making the combination." Id. "The extent to which such suggestion must be explicit in, or may be fairly inferred from, the references, is decided on the facts of each case, in light of the prior art and its relationship to the applicant's invention." In re Gorman, 933 F.2d 982, 986–87 (Fed.Cir.1991). "As in all determinations under 35 U.S.C. § 103, the decisionmaker must bring judgment to bear." Id., at 987.

57. The scope of the prior art is defined as the art of designing and manufacturing conical rock crushers. (NFOF at ¶ 157–58; NCOL at ¶ 110.) The art considered by the Examiner during prosecution and the art cited by Telsmith, and discussed herein (FOF at ¶¶ 20–33), is the content of the prior art.

58. The parties agree that the hypothetical person of ordinary skill in the pertinent art is one with a Bachelor's Degree in engineering and at least five years of experience in designing and manufacturing conical crusher machines under the direction of a designer with 10–20 years experience. (NFOF at ¶ 159; TFOF at ¶ 28.) Both Gieschen and Stafford qualified as persons of ordinary skill in the art at the time the invention was made. (NFOF at ¶ 160.)

59. The Court will limit its discussion of the differences between the claims-in-suit and the prior art to those prior art references focused upon by Telsmith. As an initial matter, it is clear that none of the references relied upon by Telsmith are directed to a conical crusher which employs double acting hydraulic cylinders for both tramp relief and clearing, and which biases the upper frame against the lower frame in an abutting relationship during normal crushing. (NCOL at ¶ 162.) The references, however, disclose crushers having portions of this combination of elements. Indeed, "all of the features of [the claims-in-suit] were known to the art, and ... various combinations of these elements existed in known similar structures." Gorman, 933 F.2d at 986.

60. For example, the British '091 Patent, the Jeffrey crusher, the Autocone brochure and the Wedag brochure all disclosed crushers that employed double-acting hydraulic cylinders to perform tramp relief and clearing. (FOF at ¶¶ 23–24, 29–32, 61.) Nordberg distinguished these references, however, on the grounds that they do not disclose the abutting relationship between the upper and lower frames. (Id.)

61. The Saunders Patent discloses a crusher with double-acting hydraulic cylinders and the abutting relationship between the upper and lower frames missing from the preceding references. (FOF at ¶¶ 26–28.) The hydraulic cylinders clearly perform the clearing function and clearly exert the biasing force for the necessary abutting relationship. (Id.) The hydraulic cylinders, however, are in series with a group of coil springs. (Id.) This distinction makes it unclear whether the hydraulic cylinders perform the tramp relief function. (Id.)

62. The El Jay/Cedarapids Rollercone and the Telsmith 1100E also had the abutting relationship between the upper and lower frames. (FOF at ¶¶ 20–21.) However,

the Rollercone only had single-acting hydraulic cylinders for tramp relief purposes and no mechanism for clearing the crusher. (Id.) The 1100E used coil springs for tramp relief purposes and also had no mechanism for clearing the crusher. (Id.)

63. The Bjarme '571 Patent combines the performance of all three functions, *i.e.*, tramp release, clearing and the abutting relationship, in one device or mechanism. (FOF at ¶ 33.) Bjarme uses double-acting pneumatic cylinders, however, instead of hydraulics. (Id.)

 64. Having listed the differences between the prior art and claims-in-suit, the Court must now bring its judgment to bear. In cases involving the combination of known elements, an important factor in determining whether the prior art as a whole suggested the desirability of the combination is whether the elements of the claims-in-suit are "used in substantially the same manner, in devices in the same field of endeavor." *Gorman,* 933 F.2d at 987–88. Where the claim elements "are all shown in the cited references in various subcombinations, used in the same way, for the same purpose as in the claimed invention", and where the references are all from the same pertinent art or field of endeavor as the claimed invention, a strong case of obviousness is made. *Id.* This makes sense. Where the combination at issue involves elements that are found in a wide variety of different arts or industries, industries that may be wholly unrelated to the art of the claimed invention, the suggestion that they be combined to make the claimed invention is understandably weak. So too where the elements are used in a way or for a result wholly different from their use and purpose in the claimed invention. In such cases, the variety of industries and variety of uses may actually teach away from, rather than suggest, the specific use in the specific industry of the claimed invention.

65. Here, all of the references relied upon by Telsmith fall within the pertinent art of conical rock crushers. Moreover, all of the elements of the claims-in-suit "are all shown in the cited references in various subcombinations, used in the same way, for the same purpose as in the claimed invention." For example, like the 373 Patent, the prior art is replete with devices using double-acting hydraulic cylinders to perform both tramp relief and clearing. (COL at ¶ 60.) While these devices did not have the abutting relationship, the prior art is also replete with devices that had the abutting relationship in order to create a fixed reference point between the upper and lower frames. (COL at ¶¶ 61–63.) Indeed, the prior art shows that the abutting relationship was used in crushers of every type, including coil springs (the 1100E), single-acting hydraulic cylinders (the Rollercone), double-acting hydraulic cylinders (the Saunders Patent), and double-acting pneumatic cylinders (the Bjarme Patent). (Id.)

66. The foregoing strikes the Court as clear and convincing evidence that a person of ordinary skill in the art, reviewing the foregoing prior art references, would see therein the desirability of combining their teachings and designing a device that used double-acting hydraulic cylinders to perform both tramp relief and clearing and to create the abutting relationship. It is undeniable that the benefits of mechanical tramp relief and clearing, whether hydraulic or pneumatic, were well known in the art at the time of the claimed invention. It is also undeniable that the benefits of an abutting relationship were well known in the art at the time. More importantly, there was prior art combining all three features into one device, *i.e.,* the Bjarme patent. Like the 373 Patent, Bjarme used double-acting cylinders to perform both tramp relief and clearing and to bias the upper frame against the lower frame in an abutting relationship. Bjarme used *pneumatic* cylinders, however, instead of hydraulic. All a person of ordinary skill in the art had to do to get to the 373 Patent from Bjarme was to substitute hydraulic cylinders and the corresponding accumulator for the pneumatic cylinders. Numerous other prior art references using double-acting hydraulic cylinders suggested how that could be done. Moreover, the advantages of hydraulics over pneumatics are considerable and were well known in the art at the time of the invention, thereby suggesting the desirability of substituting hydraulics for pneumatics. Therefore,

the Court believes the invention of the 373 Patent was obvious, because the prior art, viewed as a whole, suggested to one of ordinary skill in the art the combination of known elements which resulted in the claims-in-suit.

67. This conclusion is further supported by Stafford's simultaneous and independent development of the 1100F. While Nordberg is correct in stating that the 1100F is not part of the prior art, this does not make it irrelevant to the obviousness question. It is well-established that contemporaneous and independent development of the claims-in-suit by another inventor strongly suggests that the invention of the patent was obvious. *See generally, In re Merck & Co.*, 800 F.2d 1091, 1098 (Fed.Cir.1986); *Lerner v. Child Guidance Products, Inc.*, 547 F.2d 29, 31 (2nd Cir.1976); *Trilogy*, 754 F.Supp. at 507. The fact that Stafford was a person of ordinary skill in the art at the time that he and Gieschen were designing and testing their respective machines further suggests that the prior art suggested the desirability of such a combination to the hypothetical person of ordinary skill.

68. Nordberg could rebut a finding of obviousness with a strong showing on the secondary considerations, but the evidence on these considerations falls far short. First there is the question of commercial success. "When a patentee asserts that commercial success supports its contention of nonobviousness, there must of course be a sufficient relationship between the commercial success and the patented invention." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed.Cir.1988). "A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent. When the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process—the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold."

*Id.* The latter is the case here. The claims-in-suit are only a component of Nordberg's conical rock crushers. Those crushers did not achieve immediate commercial success. It took four years before Nordberg sold more hydraulic crushers than spring crushers. (FOF at ¶ 85.) Even though they eventually sold well, the only evidence tying their success to the claims-in-suit is Szalanski's general testimony that, in his opinion, the hydraulic tramp relief and clearing mechanisms were the key to their success. (FOF at ¶ 87.) Such undocumented and lay opinion testimony from a witness employed by the patentee is not legally sufficient to create a prima facie case of nexus. This is particularly true when we consider the fact that only the larger and higher capacity model of Nordberg's crushers incorporating the claims-in-suit achieved any dramatic success. Szalanski suggested this was because the larger model was both portable and had a higher capacity, but these are not the features which distinguished the claims-in-suit from the prior art and which Nordberg argued in support of obtaining a patent. Finally, even if there were a prima facie case of nexus, it is still unclear to what degree the machines were successful. We know that after four years on the market, Nordberg was selling more hydraulic machines than spring machines, but we do not know how these sales compared to Nordberg's competitors. We have no evidence of Nordberg's market share before and after these machines were introduced. (FOF at ¶ 86.) Such evidence is critical to a showing of commercial success. *Vandenberg v. Dairy Equipment Co.*, 740 F.2d 1560, 1567 (Fed. Cir.1984).

69. Gieschen and Szalanski testified that there was an unfilled and long-felt need in the industry to address the operational problems of spring-type crushers, these being the handling of tramp material in an efficient manner and the quick and safe clearing of a stalled crusher. (NFOF at ¶ 209.) The Court's prior analysis calls into question the notion that this need was unfilled. There were plenty of machines that used double-acting hydraulic cylinders to perform tramp relief and clearing. (COL at ¶ 65.) While these machines lacked the abutting relation-

ship, the abutting relationship was well known in the art and Bjarme, in fact, incorporated the abutting relationship with double-acting pneumatic cylinders to perform all three functions. (FOF at ¶¶ 65–66.) While pneumatic cylinders are less safe than hydraulics, there is no testimony that safety was the unfilled and long-felt need met by the 373 Patent, nor would such testimony be convincing on this point.

70. Nordberg argues that the fact that the elements of the claims-in-suit were known in the art for a long time prior to the 373 Patent and that there were numerous prior art references containing various subcombinations of these elements indicates the nonobviousness of the invention. (NFOF at ¶ 213.) This is not necessarily true. "The criterion . . . is not the number of references, but what they would have meant to a person of ordinary skill in the field of the invention." *Gorman*, 933 F.2d at 986. Here, where the large number of prior art references come from the same field or industry as the claims-in-suit and where they, taken as a whole, use all of the elements of the patented invention in substantially the same manner for the same result, they actually strengthen the obviousness conclusion. *Id.*, at 986–87.

71. Nordberg argues that the Jeffrey crusher and Telsmith's 1100F represent two failed attempts to design a machine like the 373 Patent and that these failures bolster Nordberg's claim that the invention was not obvious. (NFOF at ¶¶ 214–16.) These attempts were not really failures, at least not in a sense that is relevant to the obviousness question. As Nordberg argued, they were only "commercially unsuccessful". (NFOF at ¶ 214.) If a similar or identical machine is designed prior to or contemporaneous with the patented invention, the existence of that machine may suggest that the basic concepts of the claimed invention were obvious to those skilled in the art even though the machine was not commercially viable. *Vandenberg*, 740 F.2d at 1567. Moreover, a review of the testimony and other evidence regarding the testing of these devices shows that the hydraulic systems operated satisfactorily and that any alleged "commercial failure" was primarily attributable to problems with other features of the machines and/or their price. (Ex. 501 at 11; FOF at ¶ 54.)

72. There is very little evidence of competitive copying. (TT, Vol. 5 at 936–37.) As stated earlier, there is no evidence that Stafford had information regarding the Model B when he designed and developed the 1100F. (FOF at ¶ 47.) Nor is Telsmith's desire to enter the 7′ crusher market or Telsmith's purchase of an unpatented 7′ SYMONS crusher in order to copy parts unrelated to the hydraulic system of the 373 Patent evidence that Telsmith tried to copy the claims-in-suit. (FOF at ¶ 84.)

73. Nordberg also argues that Telsmith noted the commercial success of the Omnicone and designed the Model 57 to compete against it. (NFOF at ¶¶ 220, 224–26.) But the Model 57 is not a copy of the Omnicone. All of Telsmith's crushers sold since 1984 do not read on the 373 Patent because they incorporate the additional check valve which prevents fluid communication between the cylinders and the accumulator during tramp relief. (FOF at ¶¶ 81–84.)

74. Given the foregoing, the Court finds that Telsmith has proved by clear and convincing evidence that the invention of the 373 Patent would have been obvious to a person of ordinary skill in the art at the time it was made. Of course, this conclusion contradicts the conclusions reached by the Patent Office during the initial prosecution and the reexamination. However, the Court has already noted the Examiner's confusion and seeming inability to understand the claims-in-suit, and Nordberg's own expert described the Examiner's comments during the initial prosecution as "bizarre". (FOF at ¶¶ 58–64.) Moreover, the Court cannot help but notice an important inconsistency between the positions taken by Nordberg during the initial prosecution and the reexamination. That is, during the initial prosecution, and during trial, Nordberg distinguished much of the cited prior art on the grounds that, while several machines had the requisite abutting relationship, they did not have double-acting hydraulic cylinders to perform both tramp relief and clearing. (FOF at ¶¶ 20–21; see also, Ex. 1., Col. 8, Lines 54–58; TT, Vol. 1 at 86–120, Vol. 4 at 744–45, 755, 761–62, Vol. 5

at 922–24.) During the reexamination, Nordberg distinguished the newfound prior art on the grounds that, while they had double-acting hydraulic cylinders for tramp relief and clearing, they did not have the abutting relationship. (FOF at ¶¶ 23–24; TT, Vol. 5 at 922–24.) The Examiner failed to notice this obvious inconsistency during the reexamination. (Id.) And, as stated earlier, the inconsistency is not cured by an allegation that Nordberg's device was the first to perform these three functions, *i.e.*, tramp relief, clearing and the abutting relationship, in one device. Bjarme had already done so with double-acting pneumatic cylinders and Saunders very nearly did it with double-acting hydraulic cylinders. (FOF at ¶¶ 26–28, 33.) Thus, the particular facts surrounding the prosecution and reexamination of the 373 Patent call into question the soundness of the Examiner's conclusions therein.

### D. Indefiniteness

75. 35 U.S.C. § 112 requires that "[t]he specification [of the patent] ... conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." (TCOL at ¶ 93.) The determination of whether the 373 Patent is definite and complies with the requirements of § 112 is a question of law. (NCOL at ¶ 139.)

76. Telsmith argues that the terms "upper frame assembly", "lower frame assembly", "upper frame", "lower frame", and "signal" are vague and undefined in the 373 Patent and that their meanings are not made apparent in the claims, specifications or drawings. (FOF at ¶ 88.)

77. The test of indefiniteness is whether the disclosure in the patent is sufficient to enable one of ordinary skill in the art to understand and practice what is claimed. (NCOL at ¶ 140.) A corollary is that the claims must be sufficiently definite so that others can determine whether their activities infringe. (TCOL at ¶ 95.) A determination of definiteness involves a consideration of the specification, drawings, and other evidence in light of the knowledge possessed by those skilled in the art. (NCOL at ¶ 140.) The burden of proof is upon Telsmith to demonstrate by clear and convincing evidence that one of ordinary skill in the art would not recognize a description of the claimed invention in the specification and drawings. (Id.)

78. Telsmith has not met its burden here. Based upon its review of the claims, specifications and drawings, the Court thinks it fairly clear that the term "frame" is used as shorthand for the term "frame assembly" in the 373 Patent and that the two are interchangeable in meaning. (NFOF at ¶ 235.) Moreover, it is clear from the claim language itself that the upper and lower frames or frame assemblies cannot include the pistons and cylinders, which is the meaning Telsmith posits as a basis for finding the terms indefinite. (FOF at ¶ 31, fn. 10.) As for the term "signal", it is clear to the Court that one of ordinary skill in the art would read that term, in the context of the patent claims and specifications, to mean the shifting of the 4–way directional valve, either manually or electrically. (NFOF at ¶ 232; TFOF at ¶ 139.) This is sufficient to place him in possession of the invention and to enable him to determine whether or not he is infringing the patent. Thus, the 373 Patent contains sufficient disclosure to enable one of ordinary skill in the art to make and practice, or avoid making and practicing, what is claimed.

### III. INFRINGEMENT

#### A. Literal Infringement

79. Judge Warren's decision on Telsmith's earlier summary judgment motion is the law of the case, and that decision rightly concluded that the only Telsmith devices which could literally infringe the 373 Patent would be any crusher that incorporated the C4Y directional valve that did not have the internal check valve. (See, Decision and Order Dated 3/25/92.) Neither party disputed this conclusion during the trial or in their post-trial submissions. This renders the Court's literal infringement analysis fairly straightforward.

80. Nordberg has the burden of proving infringement by a preponderance of the evidence. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed.Cir.1983). The evidence shows that Telsmith manufac-

tured only two crushers that included the C4Y directional valve: The 1100F and the 1310 Gyrasphere demonstrated at a trade show in February, 1987. (FOF at ¶¶ 47–55, 81–84; see also, TT, Vol. 8 at 1546–47.) The 1100F was subsequently sold to an Alabama buyer and there is no indication that the C4Y valve was removed or replaced. (FOF at ¶ 55.) Therefore, the manufacture and sale of the 1100F literally infringed the 373 Patent.

■ 81. The original 1310 Gyrasphere never actually worked, either in the shop or at the 1987 trade show, because a dump valve failed on both occasions. (FOF at ¶¶ 81–84.) As a result of these failures, the dump valve was removed from that crusher and the switch was made to the C6Y directional valve containing the internal check valve. (Id.) Therefore, any subsequent sale of that 1310 crusher did not literally infringe the 373 Patent. The fact that it was originally manufactured with a C4Y valve and used in that condition at the 1987 trade show, however, even though it did not ultimately work, could be an infringing use. "Direct infringement of a patent consists generally of making, using, or selling the patented invention." *Decca Ltd. v. United States,* 640 F.2d 1156, 1167, fn. 15, 225 Ct.Cl. 326 (1980). The 1310 was certainly made and used. Telsmith argues, however, that the 1310 at issue did not infringe because infringement requires "a complete, operable device". (TCOL at ¶ 122.) Telsmith argues the 1310 was not "complete" and "operable" because it did not work. (Id.) The Court does not agree. The 1310, at least insofar as the tramp relief and clearing functions were concerned, used the same basic hydraulic system that Telsmith had conceived and reduced to practice through its development of the 1100F. That system was certainly complete and had proven operable. The fact that this particular crusher malfunctioned, exposing the desirability of a design change, does not make it incomplete or inoperable for purposes of literal infringement. Therefore, the manufacture and use of the 1310 Gyrasphere at the 1987 trade show literally infringed the 373 Patent.

82. Nordberg failed to show by a preponderance of the evidence that any other crushers manufactured, used or sold by Telsmith literally infringe the 373 Patent. (FOF at ¶¶ 81–84.) The repair files confirm Bremer's and Stafford's testimony that every accused Telsmith crusher manufactured and sold after the 1987 trade show contained the C6Y directional valve that incorporates the internal check valve. (Id.) That check valve prevents fluid communication between the hydraulic cylinders and the accumulator during tramp relief. Such fluid communication is a necessary element of independent Claim 8 of the 373 Patent. Because this claim does not read on the accused crushers, and because the remaining claims-in-suit are dependent upon Claim 8, there is no literal infringement.

**B. Doctrine of Equivalents.**

83. "The doctrine of equivalents comes into play only when actual literal infringement is not present." *Hughes,* 717 F.2d at 1361. "Under the doctrine of equivalents, an accused product that does not literally infringe a structural claim may yet be found an infringement 'if it performs substantially the same *function* in substantially the same *way* to obtain the same *result*' as the claimed product or process." *Id.* (Citations omitted; emphasis supplied.) "If any one of these three elements of equivalence are not present in the accused device, then there is no infringement of that claim." *Micro Motion, Inc. v. Exac Corp.,* 741 F.Supp. 1426, 1432 (N.D.Cal.1990). Moreover, "[i]t is ... well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed.Cir.1991). "There can be no infringement as a matter of law if a claim limitation is totally missing from the accused device." *Id.,* at 1539.

84. The policies underlying the doctrine of equivalents are well known. "The doctrine of equivalents is a judicially-created equitable doctrine designed to prevent an infringer who does not literally infringe an

invention from nonetheless 'stealing the benefit of an invention.'" *Micro Motion,* 741 F.Supp. at 1432. (Citations omitted.) The doctrine prevents "an unscrupulous copyist" from making "unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim." *Valmont Industries, Inc. v. Reinke Mfg. Co.,* 983 F.2d 1039, 1043, 25 U.S.P.Q.2d 1451, 1454 (Fed.Cir.1993). A "patentee should not be deprived of the benefits of his patent by competitors who appropriate the essence of an invention while barely avoiding the literal language of the claims." *London,* 946 F.2d at 1538. "Although designing or inventing around patents to make new inventions is encouraged, piracy is not. Thus, where an infringer, instead of inventing around a patent by making a substantial change, merely makes an insubstantial change, essentially misappropriating or even 'stealing' the patented invention, infringement may lie under the doctrine of equivalents." *Id.* "Application of the doctrine of equivalents is the exception, however, not the rule, for if the public comes to believe (or fear) that the language of patent claims can never be relied on, and that the doctrine of equivalents is simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims, then claims will cease to serve their intended purpose. Competitors will never know whether their actions infringe a granted patent." *Id.*

■ 85. Telsmith seizes upon the latter language to argue that its accused crushers cannot be found to infringe under the doctrine of equivalents unless it is first shown that Telsmith copied, stole or pirated the invention of the 373 Patent. Clearly, there is no evidence that Telsmith or Stafford had any knowledge of the 373 Patent, or of the specific claims-in-suit, at the time they designed the hydraulic circuit used in the accused crushers. There is no evidence that Telsmith or Stafford designed around the 373 Patent. In fact, the clear evidence is that Telsmith's development of the 1100F was relatively simultaneous with, and independent of, Nordberg's development of the Model B. (FOF at ¶¶ 47–55.) Moreover, the

evidence indicates that the switch to a C6Y directional valve in 1987 was the result of a failed dump valve and not an attempt by Telsmith to avoid the claims-in-suit. (FOF at ¶¶ 81–84.) In any event, the Court finds little support for Telsmith's claim that one must be an actual copyist before one can infringe a patent under the doctrine of equivalents. No federal court has ever applied such a requirement or held the doctrine of equivalents inapplicable on these grounds. More importantly, the Federal Circuit has obtained briefing on the issue in *Hilton Davis Chemical Co. v. Warner–Jenkinson Company, Inc.,* 1993 WL 761179, 1993 U.S.App.Lexis 38138 (Fed.Cir. 12/3/93), in which a decision could be issued shortly, and thus it would be pointless and inappropriate for the Court to try and anticipate the Federal Circuit's decision in this regard. Therefore, the Court finds that Telsmith did not and, under current law, need not have copied the 373 Patent in order to infringe under the doctrine of equivalents.

■ 86. Under the doctrine of equivalents, "the range of equivalents to which a patent claim is entitled falls on a sliding scale that depends on the nature of the invention." *Crown Cork & Seal Co. v. Ethyl Corp.,* 11 U.S.P.Q.2d 1577, 1588, 1989 WL 120608 (E.D.Va.1989). On one hand, "[a] pioneer invention is entitled to a broad range of equivalents." *Perkin–Elmer Corp. v. Westinghouse Electric Corp.,* 822 F.2d 1528, 1532 (Fed.Cir.1987). As discussed *supra,* the claims-in-suit are a combination of old elements well-known in the prior art of conical crushers but never before combined in the exact manner chosen by Gieschen. (COL at ¶¶ 59–65.) They represent, at best, an "improved means" for performing tramp relief and clearing in a conical crusher with an abutting relationship between the upper and lower frames. *National Latex Products Company v. Sun Rubber Company,* 274 F.2d 224, 244 (6th Cir.1959). A patent claim that merely improves upon or combines features already existing in a relatively crowded prior art, even if valid, is not a "pioneering invention" and is therefore accorded a very narrow and restricted range of equivalents:

Under the established patent law, if Martin were a pioneer patent, the court would apply a liberal construction and tend to hold the Miller devices equivalent to those of Martin.... But, as the District Court recognized, this was not a pioneer patent. The art was crowded. The principal elements of Martin were old and found in various workable prior patents in the same art.

*National Latex*, 274 F.2d at 244 (citations omitted).

Since the invention is claimed to reside in a new combination of old elements, the doctrine of equivalents can have only a restricted application.

*Berry Brothers Corp. v. Sigmon*, 317 F.2d 700, 705 (4th Cir.1963).

The mere fact that the accused article performs the same function and achieves the same result as the patented article does not necessarily establish infringement unless it can be found that this is accomplished in substantially the same way *and where, as in this case, the art is fairly crowded and the main elements of the patent are found or indicated in prior art, this issue should be determined narrowly rather than liberally. If in fact, not merely colorably, the accused article departs from the teaching of the patent in the means by which it achieves the result there is no infringement.*

*Lockwood v. Langendorf United Bakeries, Inc.*, 324 F.2d 82, 88 (9th Cir.1963). (Emphasis supplied.)

One must start with the claim, and, though a "nonpioneer" invention may be entitled to some range of equivalents, a court may not, under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.

*Perkin–Elmer*, 822 F.2d at 1532.

87. Nordberg suggests that the claims of the 373 Patent should be construed liberally because the invention has enjoyed considerable commercial success. However, as discussed earlier, the evidence of commercial success is incomplete and fails to sufficiently tie the success of Nordberg's Omnicone crushers to the claims-in-suit. (COL at ¶ 68.) Moreover, "[t]hat an improvement enjoys commercial success and has some industry impact, as many do, cannot compel a finding that an improvement falls within the pioneer category." *Id.* The Court therefore concludes that the 373 Patent is not a pioneer invention and is entitled to only a narrow range of equivalents.

88. With this in mind, the Court applies the doctrine of equivalents to the facts of this case. "Determination of infringement under this doctrine is a two-step process." *Micro Motion*, 741 F.Supp. at 1432. "First, the literal language of the claims must be construed to determine their meaning and scope. Any definitional questions are to be resolved by reference to the patent specifications, its prosecution history, the prior art, and expert testimony." *Id.* "Second, the construed claims must be compared with the accused device, to determine whether the accused device includes each element of the claims or its substantial equivalent." *Id.* "Where the construed claims are different from the accused device, only insubstantial changes between the construed claims and the accused device constitute infringement under this doctrine." *Id.* An insubstantial change is one which, "from the perspective of one of ordinary skill in the art, adds nothing of significance to the claimed invention." *Valmont*, 983 F.2d at 1043, 25 U.S.P.Q.2d at 1454.

89. The parties basically agree that the equivalents issue turns upon the last element of claim 8, which discloses the function and operation of the accumulator during tramp relief in the 373 Patent:

... and further including at least one normally pressurized accumulator in fluid communication with said one end of one of said cylinders to receive fluid displaced from said one cylinder when tramp material passes through the crushing cavity between said head and said bowl.

(NFOF at ¶¶ 257–261, 282; TCOL at ¶ 138.) The parties agree that, with respect to this claim limitation, the accused crushers operate in a different way. (TT, Vol. 3 at 471–79, Vol. 4 at 794–797, Vol. 5 at 1036–37.) That

is, in the 373 circuit, oil displaced from the rod end of the hydraulic cylinders during tramp relief is sent to the corresponding accumulator. (FOF at ¶ 74.) It stays there until the tramp passes and the upper frame reseats, at which point the same oil is sent back to the rod end of the same cylinders, creating a "to-and-fro" type of action. (Id.) In the Telsmith circuit, however, oil displaced from the rod end of the hydraulic cylinders during tramp relief is first sent over a relief valve and then into the blind end of that same cylinder. (FOF at ¶ 79.) It stays there until the tramp passes and the upper frame reseats, at which point the oil is dumped back to tank. (Id.) There it mixes with the other oil contained in the tank. (Id.) Should there be a sufficient loss of pressure in the circuit as a result of passing the tramp, the pump will turn on and send oil from the tank into the accumulator and the rod end of the cylinders until proper pressure is restored. (Id.)

90. Having found that the accused crushers operate in a different way, the Court must now determine whether the difference is insubstantial, *i.e.,* whether the difference is one which, "from the perspective of one of ordinary skill in the art, adds nothing of significance to the claimed invention." *Valmont,* 983 F.2d at 1043, 25 U.S.P.Q.2d at 1454. In answering this question, the Court first notes that Gieschen himself, the inventor of the 373 Patent and a person of ordinary skill in the art at the time the invention was made, considered the "to-and-fro" feature of his device an important distinction. In a 1985 memo discussing the differences between the 373 Patent and the 091 Patent, he stated that the short, direct fluid communication between the hydraulic cylinders and the accumulator, with no interposed valve, was a superior form of tramp relief:

If we must argue from claim wording only, we must attack the wording about the four-way valve. What they call a storage battery, we call an accumulator; in function and diagrammatic illustration, the two are equivalent. They say the upper cylinder space is connected to the storage battery THROUGH a four-way valve. *Our description and illustration clearly show our upper cylinder space in constant communication with our accumulator with no interposed valve.* True, we show a four-way valve elsewhere, but we use it only to initially pressurize or recharge our system.

Our design is better because we use a short, generously sized connection between the cylinder and the accumulator. We mount the accumulators on the crusher near the cylinders and we use multiple accumulators. Each crushing stroke takes only about one-fourth of a second. When passing uncrushable material, the connection must handle large momentary flow rates. In the reference patent, the resistance of the connecting pressure duct (3) and the four-way valve (5) will be significant at the flow rates involved, resulting in undesirable higher transient pressures in the cylinder chambers.

—Page 2, lines 70–77, covers the method of passing uncrushable material and describes a throttling function which causes the movable part to descend gradually. During this time, the crusher would be producing unwanted oversize product. *We have no significant flow back to tank. Our oil moves to the accumulator and back to the cylinders quickly.* Our crusher descends almost instantly, thereby minimizing production of oversize.

(Ex. 562; see also, TT, Vol. 1 at 143–47, Vol. 2 at 207–08.) (Emphasis supplied.) The accused crushers have an even more significant change than the 091 Patent discussed in the above memo. (TT, Vol. 5 at 888–93.) That is, the interposed selector valve in the 091 Patent created higher pressures during tramp relief and slowed the tramp relief process, but there was still direct fluid communication between the hydraulic cylinders and the accumulator during tramp relief. (Id.) In the accused crushers, the interposed valve contains an internal check valve which prevents *any* direct fluid communication between the cylinders and the accumulator during tramp relief. (Id.) Thus, in his memo, Gieschen thought that slowing down the "to-and-fro" action between the cylinders and the accumulator created a substantial difference from his invention. Certainly removing the "to-and-fro" action altogether is a difference

at least equally substantial—and probably more substantial—than simply slowing it down.

91. Despite the foregoing, Professor Henke testified that, in his expert opinion, the fact that the Telsmith circuit, during tramp relief, displaces oil from the rod end of the cylinders over a relief valve to the blind end of the cylinders and then back to tank does not present a substantial difference in the way the two circuits operate. (TT, Vol. 3 at 475–79.) He justifies his opinion on the following logic: The oil from the rod end of the cylinder is ultimately sent back to tank, where it mixes in with the other oil already in the tank, and then is ultimately—perhaps immediately—sent back to the accumulator to recharge the circuit after the loss of pressure, which Henke assumes to occur during any tramp relief episode. He thus concludes that there is a substantially equivalent fluid communication between the hydraulic cylinders and the accumulator during tramp relief in the Telsmith circuit. (Id.) The Court does not accept this conclusion. First, Gieschen's memo concerning the 091 Patent emphasizes the fact that the fluid communication between the cylinders and the accumulator in his circuit is *direct, i.e.*, "with no interposed valve" and "no significant flow back to tank". (COL at ¶ 90.) This, according to Gieschen, is not an insubstantial difference because it enables "[o]ur oil [to] move[ ] to the accumulator and back to the cylinders quickly ... thereby minimizing production of oversize." (Id.) In light of Gieschen's memo, Henke's logic clearly stretches the meaning of "fluid communication" well beyond its natural and intended meaning when he suggests that its equivalent is found in molecules of oil being displaced to tank during tramp relief, there mixing together with molecules of oil already in the tank, and then the "mixture" being sent to the accumulator to recharge the system. Such logic essentially reads this limitation out of the patent. Again, "a court may not, under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." *Perkin–Elmer*, 822 F.2d at 1532. Second, Henke's description of the operation of the Telsmith circuit does not strike the Court as logically correct. That is, assuming the molecules of oil displaced to tank during tramp relief disperse evenly throughout the oil already present, some of those molecules are going to stay in the tank. Henke does not claim that the tank *empties* when it recharges the circuit. While this criticism of Henke's approach may seem a bit technical, so is Henke's approach. Technicality is required because Henke and Nordberg refuse to admit the obvious: There is no "fluid communication", or its substantial equivalent, between the hydraulic cylinders and the accumulator during tramp relief in the accused crushers. The result is that the two circuits perform tramp relief in two substantially different ways.

92. The same point can be made by focusing on the function of the accumulators in the respective circuits. Clearly, the accumulators in both circuits serve to maintain pressure in the system. But in the 373 Patent, it is clear that the primary function of the accumulators is to absorb or provide a cushion for the increased pressures created when a piece of tramp enters the crushing cavity. (TT, Vol. 1 at 30–31, 132, Vol. 3 at 504–10.) It does this by receiving the oil displaced from the cylinders during tramp relief and sending the same oil back to the cylinders after tramp relief, *i.e.*, by the "to-and-fro" relationship discussed earlier. (Id.) In the Telsmith circuit, the single accumulator plays no role in relieving the pressures created by the entry of tramp into the crushing cavity. (Id.) These pressures are relieved by the opening of the relief valve near the cylinders, which allows the compressed oil from the rod end of the cylinder to vent through to the blind end and back to tank. (Id.) Even if, under Henke's view, some of this oil is immediately pumped back into the circuit and to the accumulator, it is done so only to recharge the system. It is not done to relieve the increased pressures created by tramp iron. Thus, the accumulator in the Telsmith circuit has a substantially different function than the accumulators in the 373 Patent. This substantially different function, in turn, results in tramp relief being performed in a substantially different way.

93. Indeed, focusing on the function of the accumulator points out an inconsistency in Gieschen's and Henke's testimony which, in the Court's mind, undercuts Nordberg's position in this regard. That is, when offering their opinions as to why Saunders did not read on the 373 Patent, both Gieschen and Henke noted that the accumulator played no role in the performance of tramp relief. (TT, Vol. 2 at 240–41, Vol. 3 at 425–33.) They drew this conclusion from their belief that, during tramp relief, there is no oil displaced from the hydraulic cylinders because the coil springs are sufficient to absorb the increased pressures created by tramp iron. (Id.) Similarly, in the Telsmith circuit, the accumulator plays no role in relieving the pressures created by tramp iron. It may help to reseat the upper frame after tramp relief and in maintaining pressure throughout the system, but this is not the primary function of the accumulators as described in the 373 Patent.

94. The foregoing differences have significant repercussions. For example, expert testimony established that Telsmith's circuit will maintain relatively safe, uniform pressures within the system during tramp relief no matter how large the tramp material may be, whereas the pressures exerted within Nordberg's system will continue to increase depending upon the size of tramp at issue. (TT, Vol. 5 at 988–95.) Moreover, Telsmith's machine, unlike the 373 Patent, maintains pressure throughout the system without the pump continually running, saving wear and tear on the pump. (TT, Vol. 5 at 1000–01.) Lastly, Telsmith's machine provides for cooler, cleaner oil throughout the hydraulic system because it sends oil to tank during tramp relief, allowing it to filtrate and cool. (TT, Vol. 5 at 1014–15.)

95. Therefore, based on the foregoing, it is clear to the Court that Nordberg failed to prove, by a preponderance of the evidence, that the accused crushers operate in the substantially same way as the 373 Patent. It is clear that, from the perspective of one of ordinary skill in the art, the presence of the check valve in the Telsmith circuit constitutes a significant change from the 373 Patent, causing a substantial change in the function of the accumulator in the circuit and a substantial change in the manner in which tramp relief is performed. Accordingly, the accused crushers do not infringe under the doctrine of equivalents.

## IV. INEQUITABLE CONDUCT

96. Telsmith argues that the 373 Patent is unenforceable because of inequitable conduct on Nordberg's part in obtaining the patent and the reexamination certificate. The conduct at issue is Nordberg's failure to fully disclose Saunders and the use of the Model B at Tanner.

97. The defense of inequitable conduct before the PTO, if proven, renders all the claims of the patent unenforceable for the life of the patent. (NCOL at ¶175.) Establishing the defense of inequitable conduct requires proof by clear and convincing evidence that inequitable conduct by the applicant or those connected with the application occurred during the application process of the patent in question. (NCOL at ¶176.) Both the elements of intent and materiality must be proven by clear and convincing evidence. (Id.) Inequitable conduct cannot be established upon a mere showing that art or information having some degree of materiality was not disclosed. (NCOL at ¶178.) It also does not flow simply from a failure to meet the requirements of patentability. (NCOL at ¶180.)

98. One who alleges a "failure to disclose" form of inequitable conduct must offer clear and convincing proof of: (1) prior art or information that is material; (2) knowledge chargeable to applicant of that prior art or information and of its materiality; and (3) failure of the applicant to disclose the art or information resulting from an intent to mislead the PTO. (NCOL at ¶181.) That proof may be rebutted by a showing that: (1) the prior art or information was not material; (2) if the prior art or information was material, a showing that the applicant did not know of that art or information; (3) if applicant did know of that art or information, a showing that applicant did not know of its materiality; (4) a showing that applicant's failure to disclose art or information did not result from an intent to mislead the PTO. (Id.)

99. Both Saunders and the use of the Model B at Tanner constitute material prior art or information not disclosed to the PTO.

100. Telsmith submits no evidence, however, that Gieschen or anyone else involved in obtaining the 373 Patent had any knowledge of the existence of the Saunders patent at any time during the initial prosecution or the reexamination. In fact, the only evidence is that Gieschen did not learn of Saunders until a few weeks before trial. (FOF at ¶ 27.) Thus, there is no evidence that Gieschen or Nordberg intentionally concealed Saunders in a deliberate attempt to mislead the PTO.

101. Telsmith also submits no evidence that Gieschen or anyone involved in obtaining the 373 Patent suspected that the use at Tanner might qualify as an invalidating public use. The only evidence in this regard is a memo raising the possibility that the Tanner use might pose a patentability problem in "absolute novelty countries", which does not include the United States. (FOF at ¶ 43, fn. 15; TT, Vol. 5 at 913.) This alone is insufficient evidence that Gieschen or Nordberg was aware of the materiality of this information at the time of the initial prosecution and reexamination. Moreover, while the Court has held the patent invalid as a result of the Tanner use, the issue was a close one and turned upon an interpretation of the legal requirements for a "reduction to practice", an issue which the Federal Circuit itself has had difficulty defining in clear and reliable terms. Under these circumstances, it is clear to the Court that Nordberg had a good faith basis for deciding that the Tanner use was not material. Inequitable conduct is not established simply because this good faith belief proved incorrect as a matter of law.

102. The Court therefore finds that Telsmith failed to prove inequitable conduct by Nordberg before the PTO.

## V. EXCEPTIONAL CASE

103. Under 35 U.S.C. § 285, the Court may award reasonable attorney fees to the prevailing party upon a finding that the case is exceptional. (TCOL at ¶ 166.)

104. A case may be found exceptional if inequitable conduct occurs during the prosecution of the patent or if the patentee is manifestly unreasonable in assessing infringement. (TCOL at ¶ 167.)

105. The Court has already ruled that no inequitable conduct occurred during the prosecution or reexamination of the 373 Patent. The Court further finds that the allegations of infringement were not manifestly unreasonable, given that the only critical difference between the 373 Patent and the accused crushers is the existence of a single internal check valve found within the hydraulic circuitry of the accused crushers. Nordberg's belief that some of the accused crushers did not contain this check valve, and that those which did nonetheless infringed under the doctrine of equivalents, was not, on the evidence presented here, manifestly unreasonable.

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Declaratory judgment shall be entered in favor of Telsmith and against Nordberg declaring that claims 8–11 and 13 of the 373 patent are invalid; and

2. Judgment shall be entered in favor of Telsmith and against Nordberg dismissing any and all claims of infringement herein.

Dated at Milwaukee, Wisconsin, this 29th day of March, 1995.

SO ORDERED.

FIG. 1

APPENDIX B
U.S. PATENT 4,478,373

APPENDIX C
## TELSMITH COMMERCIAL CRUSHERS

DOUBLE ACTING
HYD. CYLINDER
(HYDRAULIC RELIEF)
(1-CYL. SHOWN)

"CRUSH"

"CLEAR"

TO LOCK & ROTATE
FUNCTIONS

0-5,000 PSI

0-3000 PSI

PS-2
LOW
PRESSURE

PS-1
HIGH
PRESSURE

EXHIBIT
601-A